904 A.2d 875

**Cheryl HILLER, Appellee**

v.

**Shane FAUSEY, Appellant.**

Supreme Court of Pennsylvania.

Argued May 16, 2005.

Decided Aug. 22, 2006.

Howard Jonathan Bashman, Willow Grove, for Shane Fausey, appellant.

Karen Anne Wyle, Pro Hac Vice, Bloomington, IN, for Coalition for the Restoration of Parental Rights, appellant amicus curiae.

Mark Albert Momjian, Natasha Gonzalez, Philadelphia, for Cheryl Hiller, appellee.

Ellen Ruth Wase, Philadelphia, for AARP, appellee amicus curiae.

Karen Coleen Buck, Kimberly J. Krzyzaniak; Stephen Alan Feldman, Jenkintown, for Senior Law Center, et al., appellee amici curiae.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice BAER.

This Court granted allocatur in this matter to determine the constitutionality of a trial court's application of the Pennsylvania's statute governing the provision of partial custody or visitation to grandparents upon the death of their child who is also the grandchild's parent, 23 Pa.C.S. § 5311.[1] The Superior Court held that the trial court's application was constitutional. We affirm.

Shane Fausey (Father) has challenged the grant of partial custody of his son, Kaelen Fausey (Child), then age eight, to Cheryl Hiller, Child's maternal grandmother (Grandmother). Child lived with his mother (Mother) and Father from his birth in 1994 until his mother died in May 2002 after battling cancer for several years. Prior to Mother's death, Child had frequent contact with Grandmother, especially during the last two years of his mother's illness, when they saw each other on an almost daily basis. Grandmother often transported Child to and from school and cared for him when Mother attended doctors' appointments or was too ill to provide care. Further, Grandmother took on the task of preparing Child for Mother's death. The trial court found credible the testimony that Child

---

1. § 5311. When parent deceased

   If a parent of an unmarried child is deceased, the parents or grandparents of the deceased parent may be granted reasonable partial custody or visitation rights, or both, to the unmarried child by the court upon a finding that partial custody or visitation rights, or both, would be in the best interest of the child and would not interfere with the parent-child relationship. The court shall consider the amount of personal contact between the parents or grandparents of the deceased parent and the child prior to the application.
   23 Pa.C.S. § 5311.

and Grandmother enjoyed spending time together, showed a great deal of affection toward one another, and shared a very close relationship.

After Mother's death, however, Father abruptly denied Grandmother contact with Child, despite Grandmother's repeated attempts to call Father and request time with Child. Between Mother's death in May 2002 and April 2003, Grandmother saw Child on only three occasions when Child was visiting other maternal relatives.[2]

Eventually exasperated with the situation, Grandmother filed for partial custody pursuant to Section 5311. The court granted her temporary partial custody in April 2003 following a non-record custody conference, after which Father filed for modification. After extensive pre-trial activities, the court held a two-day hearing in July 2003. At its conclusion, the trial court granted Grandmother partial custody one weekend per month and one week each summer.[3]

In its thorough opinion in support of its decision, the trial court explained its application of Section 5311. In compliance with the United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), discussed in detail *infra*, the trial court applied the presumption that a fit parent acts in the child's best interests. Further, the court noted that a grandparent seeking to compel partial custody carries the burden of proof.

With these premises established, the trial court examined the facts of the case. As specifically required by Section 5311, the court first considered the contact between Child and Grandmother prior to Grandmother's petition. First, the court noted that Child's parents had permitted significant contact with Grandmother prior to Mother's death, and that a

---

**2.** Father apparently allowed Child's relationship to continue with his maternal great-grandfather (Great-grandfather) with whom Child also had a very strong relationship.

**3.** In its temporary custody order, the trial court had given Grandmother time on Christmas Day. In its final order, it omitted this provision, noting that Christmas is best spent with a parent.

strong and affectionate relationship had formed between Child and Grandmother.

Next, in accordance with *Troxel*, the court considered the likelihood and amount of contact that Father would provide to Grandmother absent a court order. As previously discussed, Grandmother had seen Child only three times between May 2002 and April 2003. Moreover, according to the trial court, Father's position on acceptable partial custody or visitation changed dramatically during the course of the proceedings.[4] After one custody conference, Father agreed to limited periods of partial custody without overnight stays. One month later he changed his mind and asserted that Grandmother should not be provided any court-ordered visitation. Father changed his position yet again at trial, where he stated that he would permit partial custody one day per month without overnight stays. Parenthetically, the court also found Father's various accusations regarding his concern's for Child's safety in Grandmother's care lacking in credibility and devoid of evidentiary support: "Given the fact that none of these concerns have any merit, the court must conclude that either [Father] is grasping at straws and inventing reasons to keep [Child] away from his grandmother, or he actually believes the allegations, which shows he is under serious delusions concerning [Grandmother] and his judgment regarding her is polluted."[5] Tr. Ct. Slip Op. at 5. Accordingly, with ample

4. Although the parties and the courts below have occasionally used the terms interchangeably, we note that Pennsylvania law distinguishes "partial custody" from "visitation." *See* 23 Pa.C.S. § 5302. A party granted "visitation" may visit a child but may not remove the child from the parent's control. *Id.* Conversely, a grant of "partial custody," as in the case at bar, allows the individual to "take possession and control of the child" and can involve potentially extensive periods of time. *Id.* The United States Supreme Court in *Troxel* and many of the courts of our sister states have utilized the term "visitation" to encompass both visitation and partial custody as defined in Pennsylvania. Therefore, when discussing the *Troxel* decision and those of our sister courts, we will use the term "visitation" generically.

5. The court supported its conclusion further, noting Father's similar treatment of Great-grandfather. The court noted:

[Father's] own testimony demonstrated that he allows his personal feelings to cloud over his judgment regarding [Child's] contact with

factual support, the trial court concluded that, absent a court order, Father would not provide Grandmother the opportunity to see Child.

The court then turned to the statute's requirement that the court find that visitation or partial custody with Grandmother would be in the child's best interests, even when applying the presumption that a parent's decision limiting contact is in the child's best interests. The court found that Father's proposed arrangement of one day per month "is not enough time to maintain the bond [Child] has established with his grandmother and her side of the family, especially given his extensive contact in the past." Tr. Ct. Slip Op. at 6. Specifically, the court noted that Grandmother is warm and loving and has developed a "longstanding, very close relationship" with Child, and that Child enjoyed spending time with her, engaging in many activities with her, and visiting with his many maternal relatives during the family gatherings that occur during the court-ordered periods of partial custody. Tr. Ct. Slip Op. at 6. Significantly, the court observed that "when [Child] is with [Grandmother], he seeks and receives emotional support regarding the death of his mother." Tr. Ct. Slip Op. at 6. This finding is particularly resonant because "[Father] himself expressed concerns regarding [Child's] ability to express his emotions regarding his mother's death." Tr. Ct. Slip Op. at 6. Thus, the court concluded, "contact with his mother's side of the family is highly beneficial emotionally for [Child] in helping him deal with the loss of his mother." Tr. Ct. Slip Op. at 6.

his family. For instance, all parties agreed that [Child] and [Great-grandfather] have an extremely close relationship, and in fact [Father] ensured the two remained in frequent contact after [Mother's] death. However, [Father] became perturbed at [Great-grandfather] throughout the custody proceedings, and testified that he no longer trusted him. Upon being questioned by the court, it was clear that [Father's] mistrust of [Great-grandfather] involved only the personal relationship between the two men, and had nothing to do with the relationship between [Child] and [Great-grandfather]. However, [Father] clearly was allowing his anger toward [Great-grandfather] to interfere with [Child's] relationship with [Great-grandfather.]
Tr. Ct. Slip Op. at 4–5.

As dictated by the statute, the trial court next considered whether the court-ordered partial custody would interfere with Father's relationship with Child. Father argued that it would interfere because of the animosity between Grandmother and him, which, he noted, had led to the legal proceedings. The trial court, however, aptly commented:

> If the mere existence of animosity and dislike between parent and grandparent were enough to prevent grandparent custody, surely there would be very few court ordered periods of grandparent custody. For after all, if the parties were able to get along together, they would not be in court to begin with.

Tr. Ct. Slip Op. at 7. Instead, the court distinguished this case from those where grandparent partial custody would have either distressed the child or adversely impacted the parent's ability to parent him. Moreover, the court found credible Grandmother's assertion that she would not express negative feelings about Father to Child, or create a situation that would negatively impact Child. The court also expressed confidence that Father would not let his animosity toward Grandmother cause harm to Child, as the court found it clear that Father was a capable father who loved his son. Additionally, the court noted that there had been no incidents of problems in the visits thus far.

The court therefore found that Grandmother had met her burden of demonstrating that partial custody would be in Child's best interests and would not interfere with the parent-child relationship, and thereby, had rebutted the presumption that Father's decision limiting or eliminating Grandmother's contact with Child was in Child's best interests. Tr. Ct. Slip. Op. at 8. The court thus granted partial custody to Grandmother one weekend per month and one week per summer.[6]

Father timely appealed to the Superior Court, asserting that the application of the statute violated his substantive due process rights under the Fourteenth Amendment to the Unit-

---

6. The court also addressed and found unavailing Father's constitutional challenges to Section 5311. These issues will be discussed in detail *infra*.

ed States Constitution.[7] In a published opinion, a panel of the Superior Court [8] acknowledged that the United States Supreme Court recently held, "it cannot be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Fausey v. Hiller*, 851 A.2d 193, 195 (Pa.Super.2004) (quoting *Troxel*, 530 U.S. at 67, 120 S.Ct. 2054). Given the fundamental right of parents, the Superior Court utilized a strict scrutiny analysis and considered whether the imposition on a parent's fundamental rights was necessary to promote a compelling state interest and was narrowly tailored to effectuate that interest. *Id.*[9]

The Superior Court began its analysis by comparing Pennsylvania's statute to the Washington State statute which the United States Supreme Court found unconstitutional as applied in *Troxel*. *Fausey*, 851 A.2d at 196. The court found Pennsylvania's statute and its application in this case "readily distinguishable" from the situation in *Troxel*.[10] Moreover, the court held that the trial court complied with Pennsylvania precedent by placing the burden of proof on the petitioning grandparent due to the deference given to the decisions of fit parents.[11] Finally, the Superior Court concluded that the trial

7. Father also asserted a facial challenge to the statute under the Equal Protection Clause, asserting that the statute treated children of single parents differently than children of married parents without a sufficient government interest. Father has not raised that challenge before this Court, and we will not address it.

8. Judge Lally–Green concurred in the result of the majority opinion written by the late Judge Cavanaugh and joined by Judge Gantman.

9. As will be discussed more fully *infra*, the United States Supreme Court specifically refused to define the "precise scope of the parental due process right in the visitation context" or to set a standard of scrutiny to be applied. *Troxel*, 530 U.S. at 73, 120 S.Ct. 2054. Justice Thomas, however, asserted that strict scrutiny should be applied to any infringement of a parent's fundamental right. *Id.* at 80, 120 S.Ct. 2054 (Thomas, J., concurring).

10. The court also concluded that the statute did not violate the Equal Protection Clause.

11. *See Charles v. Stehlik*, 560 Pa. 334, 744 A.2d 1255, 1258 (2000) (holding that, in custody disputes between a biological parent and a

court properly applied the statute with the necessary presumption that Father's decisions were in the best interests of the Child and that the record supported the trial court's conclusions that Grandmother overcame the presumption by demonstrating that partial custody was in Child's best interests and that it would not interfere with Father's relationship with Child. The Superior Court therefore affirmed the trial court's decision, finding the application of Section 5311 constitutional.

From this published decision, Father petitioned for this Court's review, which we granted to consider whether Section 5311 violates the Due Process Clause of the United States Constitution as an infringement upon a parent's fundamental rights. This issue of first impression for our Court was specifically left to the individual states in the United States Supreme Court's decision in *Troxel*, 530 U.S. at 73, 120 S.Ct. 2054 ("We do not, and need not, define today the precise scope of the parental due process right in the visitation context"). Before discussing the parties' arguments which hinge on divergent readings of the United States Supreme Court's decisions in *Troxel*, we must first discuss what the divided High Court held, what it implied, and what it left open for determination by the individual states.

The facts involved in *Troxel* are similar to those in the case before this Court. Each case involves a child's tragic loss of a parent and the later decision of the surviving parent to restrict contact between the child and a grandparent on the deceased parent's side, where the grandparent and the child had a significant relationship prior to the death of the parent. In the opinion announcing the judgment of the Court, in *Troxel*, Justice O'Connor, joined in full by Chief Justice Rehnquist and Justices Ginsburg and Breyer, initially noted that all fifty states have enacted statutes granting grandparents (and others) the ability to seek visitation or custody in part in

third party, the "evidentiary scale is tipped and tipped hard to the biological parent's side"); *B.A. v. E.E.*, 559 Pa. 545, 741 A.2d 1227, 1229 n. 1 (1999); *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512, 513–14 (1980).

"recognition of the changing realities of the American family." *Troxel,* 530 U.S. at 64, 120 S.Ct. 2054; *see also, id.* at 74 n. 1, 120 S.Ct. 2054. The statutes are designed to "ensure the welfare of the children therein by protecting the relationships those children form with such third parties." *Id.* at 64, 120 S.Ct. 2054.

The plurality acknowledged, however, that protection of these relationships comes at a cost to the parent-child relationship. In addressing the mother's argument that the Washington statute violated her due process rights under the Fourteenth Amendment, the plurality observed that "[t]he liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized" by the United States Supreme Court. *Id.* at 65, 120 S.Ct. 2054 (citing and discussing, *inter alia, Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Parham v. J.R.,* 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–5, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). "In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel,* 530 U.S. at 67, 120 S.Ct. 2054.

The plurality noted that the Washington statute at issue in *Troxel* was "breathtakingly broad" in that it stated that "any person" may petition for visitation at "any time." *Id.* Further, the plurality faulted the statute for allowing a trial court to overturn a fit parent's decision merely based on the trial court's determination of what was in the best interests of a child, in apparent tension, if not actual conflict with, the United States Supreme Court's confirmation in *Parham* of the

presumption that fit parents act in the best interests of the child. *Id.* at 68–70, 120 S.Ct. 2054 (citing statutes that protect a parent's fundamental right by providing a parental presumption). Thus, the plurality found that the trial court failed to give "special weight" to the mother's determination of the children's best interests. *Id.* at 69, 120 S.Ct. 2054. The opinion also noted that the mother did not cut off but merely limited visitation. *Id.* at 71, 120 S.Ct. 2054 (noting that some states' statutes require that a parent have actually denied all visitation). The plurality specifically criticized the trial court's "slender findings," presumption in favor of grandparent visitation, and "failure to accord significant weight to [the mother's] already having offered meaningful visitation to the [grandparents]." *Id.* The plurality then concluded, "the visitation order in this case was an unconstitutional infringement on [mother's] fundamental right to make decisions concerning the care, custody and control of her two daughters." *Id.* at 72, 120 S.Ct. 2054. "[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Id.* at 72–73, 120 S.Ct. 2054.

While the *Troxel* plurality found the trial court's application of the statute unconstitutional, it did not find the statute facially unconstitutional.[12] Instead, and directly relevant to the case *sub judice*, the plurality refused to "consider the primary constitutional question passed on by the Washington Supreme Court—whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to grant-

12. The appeal to the United States Supreme Court was from a decision of the Washington State Supreme Court. *Id.* at 63, 120 S.Ct. 2054. The Washington Supreme Court declared its statute facially unconstitutional primarily due to two problems. *Id.* First, it concluded that the statute's lack of a threshold showing of harm or potential harm to the child from the denial of visitation prevented the state's interference with the rights of parents. *Id.* Second, the state court held the statute unconstitutional because it swept too broadly and thus violated parents' rights by allowing courts to grant visitation to "any person" at "any time" based solely on a best interests analysis. *Id.*

ing visitation." *Id.* at 73, 120 S.Ct. 2054. The plurality opined,

> We do not, and need not, define today the precise scope of the parental due process right in the visitation context. In this respect, we agree with Justice Kennedy that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best "elaborated with care." Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter.

*Id.* (citation omitted).

Justice Souter concurred in the judgment of the plurality in that he also would have affirmed the judgment of the Washington Supreme Court; however, unlike the plurality he would have held the statute facially unconstitutional, finding that the statute swept too broadly by allowing "any person" to seek custody at "any time," requiring merely a showing that visitation was in the best interests of the child. *Id.* at 76, 120 S.Ct. 2054 (Souter, J., concurring). Like the plurality, Justice Souter did not rely upon the Washington State court's requirement that grandparents demonstrate harm to the child resulting from the lack of visitation prior to a constitutional grant of visitation.

Also concurring in the judgment, Justice Thomas noted the other justices' refusal to designate a standard of scrutiny to be applied to infringements on the fundamental right at issue. He asserted that strict scrutiny should be applied because the right involved was fundamental, but observed that the Washington statute in question would not even survive rational basis scrutiny for want of a legitimate government interest in "second guess[ing] a fit parent's decision regarding visitation with third parties." *Id.* at 80, 120 S.Ct. 2054 (Thomas, J., concurring).

In contrast, Justice Stevens dissented from the plurality's conclusion that the statute was unconstitutional as applied,

354

and further concluded that the statute was facially constitutional in that the statute had a "plainly legitimate sweep." *Id.* at 85, 120 S.Ct. 2054 (Stevens, J., dissenting). While the plurality and Justice Souter refused to base their conclusions on the statute's lack of a requirement of harm resulting from the lack of visitation, Justice Stevens forcefully rejected the assertion: "we have never held that the parent's liberty interest in this relationship is so inflexible as to establish a rigid constitutional shield, protecting even arbitrary parental decisions from any challenge absent a threshold finding of harm." *Id.* at 86, 120 S.Ct. 2054 (Stevens, J., dissenting). Instead, he asserted that limits on the fundamental right of parents resulted from the balancing of parental rights against the state's "long-recognized interests as *parens patriae.*" *Id.* at 88, 120 S.Ct. 2054 (Stevens, J., dissenting).[13]

Finally, Justice Kennedy dissented.[14] While acknowledging the existence of a parent's constitutional right, he asserted that the case should be reversed due to the error he found in the Washington Supreme Court's conclusion that parental rights could not be infringed without proof of something more than that visitation would be in the child's best interests. Additionally, like Justice Stevens, he concluded that a showing of harm to the child should not be required prior to a grant of visitation to a third party. *Id.* at 92, 120 S.Ct. 2054 (Kennedy, J., dissenting). Noting that many children today have significant relationships with non-parents, he opined that the parental right should be viewed differently depending on whether the case involves a claim of visitation with a complete stranger or visitation with a *de facto* parent. Although Justice Kenne-

13. Additionally, Justice Stevens espoused a potential constitutional right yet to be elucidated by the Court regarding a child's "complementary interest in preserving relationships that serve her welfare and protection." *Id.* at 88, 120 S.Ct. 2054 (Stevens, J., dissenting). "At a minimum, our prior cases recognizing that children are, generally speaking, constitutionally protected actors require that this Court reject any suggestion that when it comes to parental rights, children are so much chattel." *Id.,* at 88–89, 120 S.Ct. 2054 (Stevens, J., dissenting).

14. Justice Scalia also dissented based on his conclusion that the parental right was an unenumerated right. *Id.* at 91–92, 120 S.Ct. 2054 (Scalia, J., dissenting).

dy concluded that the best interests standard may provide sufficient protection of the parental right, he noted that the disruptive effect of litigation involved in custody battles could require a higher standard:

> Our system must confront more often the reality that litigation can itself be so disruptive that constitutional protection may be required; and I do not discount the possibility that in some instances the best interests of the child standard may provide insufficient protection to the parent-child relationship.

*Id.* at 101, 120 S.Ct. 2054 (Kennedy, J., dissenting).

The foregoing analysis demonstrates that all the Justices, with the exception of Justice Scalia, recognized the existence of a constitutionally protected right of parents to make decisions concerning the care, custody, and control of their children, which includes determining which third parties may visit with their children and to what extent. Further, a majority agrees that fit parents are entitled to a presumption that they act in the best interests of their children. However, while Justices Stevens and Kennedy explicitly concluded that the Constitution did not require a third party requesting visitation to demonstrate that the child would be harmed by the lack of visitation, the plurality refused to speak to the issue. Although Justice Thomas would apply a strict scrutiny standard of review to infringements of a parent's fundamental right, the rest of the Court was notably silent on this issue. Instead, the court left the decision, at least for the present, to the states in their case-by-case application of individual statutes.

Justice O'Connor's plurality opinion, however, provides some guidance on what constitutes *impermissible* application and thus presumably highlights issues which should raise red flags in assessing the constitutionality of a particular statute's application. As noted above, the plurality held that the Washington statute was "breathtakingly broad" in that it allowed "any person" at "any time" to petition for custody. The justices also noted that the statute failed to account for the presumption that parents act in the best interests of their children, and that the trial court in *Troxel* had, in fact,

impermissibly presumed that visitation should be granted. Finally, the plurality opinion criticized the "slender findings" supporting the trial court's overturning of the fit parent's exercise of parental discretion.

Against this backdrop, Father requests that we reverse the Superior Court and hold that it erred in concluding that Section 5311 was constitutional as applied. He attempts to diminish the importance of the differences between the statute in *Troxel* and the significantly narrower Section 5311 and, instead, focuses on the factual similarity between the case at bar and the factual scenario in *Troxel.* He claims that the trial court below failed to afford his decision "special weight," and instead substituted its view of what was in the best interests of Child, which the plurality in *Troxel* found unconstitutional. He maintains that the preponderance of the evidence standard of proof utilized by the court below should only apply between parties with equal rights to the child, such as two fit parents, and should not apply to a dispute between parents and third parties. Instead, he claims that grandparents, who cannot claim a fundamental right to visitation or partial custody, should be required to demonstrate compelling circumstances such as unfitness of the parent or significant harm to the child resulting from denial of visitation or partial custody before the courts may interfere with the parents' fundamental right to the care, custody, and control their own children. Additionally, he asserts that, like the mother in *Troxel,* he was willing to allow Grandmother some contact with Child.[15] He urges this Court to follow our sister states that have found statutes providing for visitation or partial custody either facially unconstitutional or unconstitutional as applied.

Conversely, Grandmother asserts that this case is "a paradigm of a trial court's proper application of Section 5311," in which the court "weighed all the factors necessary to render a decision that both promoted the best interests of the child and

---

**15.** As noted above, Father's assertions regarding whether he would permit contact with Grandmother absent a court order were not found credible by the trial court.

protected the substantive due process rights of the parent."
Grandmother's Brief at 12. Grandmother contends that Section 5311, unlike the "breathtakingly broad" statute in *Troxel*, strikes a perfect balance between protecting the fundamental rights of a parent and the state's interest in protecting the best interests and welfare of a child who has lost a parent and is at risk of losing his relationship with his grandparent. Grandmother observes that the *Troxel* plurality opinion contrasted the excessively broad Washington statute with more narrow statutes like Pennsylvania's.[16] Further, she notes that Pennsylvania courts have applied a weighted best interests analysis to grandparent custody cases.

Grandmother next distinguishes the *Troxel* plurality's criticism of the trial court's failure to accord special weight to the parent's decision and the court's "slender findings" of fact based in part on the trial judge's experiences with his own grandparents. In contrast, she notes the trial court *sub judice* presumed that Father would act in Child's best interests and made detailed findings of fact regarding whether it was in Child's best interests to order partial custody. Grandmother also observes that the trial court imposed the burden of proof on Grandmother, in contrast to the trial court in *Troxel*. Further, the trial court in this case carefully considered the likelihood that Father would provide Child with opportunities to continue his relationship with Grandmother and the effect that court-ordered custody would have on the parent-child relationship. Additionally relying on *Troxel* and the decisions of some of our sister states, discussed *infra*, Grandmother rejects Father's suggestion that the Constitution requires her to demonstrate parental unfitness or harm to the child resulting from the denial of partial custody.

16. In particular, Grandmother points to the Court's recognition of Minnesota's statute, Minn.Stat. § 257.022(2)(a)(2)(1998), which requires that visitation be in the best interests of the child and not interfere with the parent-child relationship and considers the amount of personal contact prior to the petition for visitation, and Nebraska's statute, Neb.Rev.Stat. § 43–1802(2)(1998), which requires clear and convincing evidence of a significant beneficial relationship, as well as a determination that visitation is in the child's best interests, and will not interfere with the parent-child relationship.

358

■ With these arguments in mind, we turn to the constitutionality of Section 5311 as applied in this case.[17] As set forth in *Troxel*, the right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental rights protected by the Due Process Clause. *Troxel*, 530 U.S. at 67, 120 S.Ct. 2054. While the United States Supreme Court declined in *Troxel* to articulate a standard of review regarding infringements of this fundamental right, this Court traditionally has applied a strict scrutiny analysis to asserted violations of fundamental rights protected by the Due Process Clause. *See Khan v. State Bd. of Auctioneer Examiners*, 577 Pa. 166, 842 A.2d 936, 947 (2004); *Nixon v. Commonwealth*, 576 Pa. 385, 839 A.2d 277, 281 (2003). While the decisions of our sister states are not binding on this Court, we further note that numerous state courts that have addressed the constitutionality of grandparent visitation statutes have also applied a strict scrutiny analysis.[18] Thus, given the fundamental nature of the right, we conclude that we must apply a strict scrutiny analysis to

17. Our scope of review of custody orders is very broad. *See Albright v. Commonwealth, ex rel. Fetters*, 491 Pa. 320, 421 A.2d 157, 158–59 (1980). However, we will not use that scope of review to nullify the factfinding functions of the trial court, and we will not reverse a trial court's custody order where the trial court has not abused its discretion. *Charles*, 744 A.2d at 1257. Moreover, our review of questions of law is plenary. *See R.M. v. Baxter*, 565 Pa. 619, 777 A.2d 446, 449 (2001).

18. Our sister states have applied strict scrutiny in the following cases when reviewing statutes, and applications thereof, relating to grandparents' or third parties' petitions for visitation: *R.S.C. v. J.B.C.*, 812 So.2d 361 (Ala.Civ.App.2001); *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002); *Roth v. Weston*, 259 Conn. 202, 789 A.2d 431 (2002); *Richardson v. Richardson*, 766 So.2d 1036 (Fl.2000); *Lulay v. Lulay*, 193 Ill.2d 455, 250 Ill.Dec. 758, 739 N.E.2d 521 (2000); *Santi v. Santi*, 633 N.W.2d 312 (Iowa 2001); *Blixt v. Blixt*, 437 Mass. 649, 774 N.E.2d 1052 (2002), *cert. denied*, 537 U.S. 1189, 123 S.Ct. 1259, 154 L.Ed.2d 1022 (2003); *Rideout v. Riendeau*, 761 A.2d 291 (Me.2000); *Hoff v. Berg*, 595 N.W.2d 285 (N.D.1999); *Moriarty v. Bradt*, 177 N.J. 84, 827 A.2d 203 (2003), *cert. denied*, 540 U.S. 1177, 124 S.Ct. 1408, 158 L.Ed.2d 78 (2004); *Harrold v. Collier*, Nos. 2004–1492, 2004–1647, 2005 WL 2483241, at *6 (Ohio Oct. 10, 2005); *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn.1993); *In re Pensom*, 126 S.W.3d 251 (Tex.Ct.App. 2003); *In re C.A.M.A.*, 154 Wash.2d 52, 109 P.3d 405 (2005); *M.B.B. v. E.R.W.*, 100 P.3d 415 (Wyo.2004).

any infringement by the state of the fundamental right of parents to direct the care, custody, and control of their children. Accordingly, as this Court has previously defined the appropriate test to apply when utilizing strict scrutiny review, we must determine if the infringement is supported by a compelling state interest and if the infringement is narrowly tailored to effectuate that interest. *See Khan,* 842 A.2d at 947; *Nixon v. Commonwealth,* 839 A.2d at 281; *see also Reno v. Flores,* 507 U.S. 292, 301–02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (commenting that Supreme Court cases have interpreted the "Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest" (emphasis in original)).

The compelling state interest at issue in this case is the state's longstanding interest in protecting the health and emotional welfare of children. Numerous times, this Court, like the United States Supreme Court, has approved of the state's exercise of its *parens patriae* interest and allowed infringements on parental rights where the welfare of children is at stake. *See In re Adoption of J.J.,* 511 Pa. 590, 515 A.2d 883, 893 (1986) (balancing state's *parens patriae* interest in protecting the welfare of a child against the parent's rights and determining that the clear and convincing evidence standard, rather than reasonable doubt, is appropriate in cases involving the termination of parental rights). For example, we have permitted the termination of parental rights and declarations of dependency. *See, e.g., In re C.A.E.,* 516 Pa. 419, 532 A.2d 802 (1987) (reinstating trial court's order terminating parental rights). Moreover, we have permitted grants of custody to non-biological parents over the objections of biological parents. *See, e.g., Charles,* 560 Pa. 334, 744 A.2d 1255 (affirming grant of primary custody to stepfather over objection of biological father); *Ellerbe,* 490 Pa. 363, 416 A.2d 512 (affirming award of primary custody to grandmother over objection of biological father).

Having recognized the existence of a compelling interest, we must determine whether the statute applied in this case is narrowly tailored to serve that interest. We first observe that Pennsylvania's statute and its application in this case are clearly distinguishable from the unconstitutional application of the statute in *Troxel.* Unlike the statute in *Troxel,* which extended standing to any person at any time, Section 5311 narrowly limits those who can seek visitation or partial custody not merely to grandparents, but specifically to grandparents whose child has died.[19] This limitation, it should be noted, furthers our General Assembly's express public policy to assure the "continuing contact of the child or children with grandparents when the parent is deceased, divorced or separated." 23 Pa.C.S. § 5301. Moreover, the rationale behind the stated public policy is clear: in the recent past, grandparents have assumed increased roles in their grandchildren's lives and our cumulative experience demonstrates the many potential benefits of strong inter-generational ties. *Troxel,* 530 U.S. at 64, 120 S.Ct. 2054.

While acknowledging the general benefits of these relationships, we cannot conclude that such a benefit always accrues in cases where grandparents force their way into grandchildren's lives through the courts, contrary to the decision of a fit parent.[20] In contrast, however, we refuse to close our minds to the possibility that in some instances a court may overturn even the decision of a fit parent to exclude a grandparent from a grandchild's life, especially where the grandparent's child is deceased and the grandparent relationship is longstanding and significant to the grandchild. We must therefore determine whether Section 5311 is narrowly tailored to protect the fundamental rights of fit parents while providing for appropri-

19. While we acknowledge that the statute applies to both grandparents and great-grandparents whose child (or grandchild) has died and left a grandchild (or great-grandchild), we refer only to grandparents for ease of discussion.

20. This consideration is especially resonant given the strain that custody litigation places on the children as well as parents and grandparents, as noted by Justice Kennedy in *Troxel,* 530 U.S. at 101, 120 S.Ct. 2054 (Kennedy, J., dissenting).

ate state intervention to protect the welfare of children through court-ordered grandparent visitation or partial custody.

In apparent response to the need to balance the state's interest and parents' rights, Section 5311 requires courts to ensure that the visitation or partial custody will not interfere with the parent-child relationship and to determine that visitation or partial custody serves the child's best interests. Finally, the Pennsylvania statute requires courts to consider the amount of contact between a grandparent and a grandchild before the petition was filed, thus allowing an assessment of the strength of the pre-petition relationship and the willingness of the parent to provide access to the child without court order.

In addition to the language of the statute, our precedent requires our courts to do what the United States Supreme Court faulted the Washington trial court for failing to do—to provide a presumption in favor of the decision of a fit parent. This Court previously has struggled with the appropriate deference to afford parents in custody matters. In *Ellerbe*, decided before the enactment of Section 5311, we determined the appropriate standard to apply when faced with a custody (not visitation or partial custody) contest between a parent and a non-parent. Initially, we noted that, in custody disputes between parents, the burden of proof is shared equally between the parties and the focus is on the best-interests of the child. *Ellerbe*, 490 Pa. 363, 416 A.2d 512. On the other extreme, we noted that the Juvenile Act, 42 Pa.C.S. § 6301, *et seq.*, dictated that, in a contest between parents and the state, the state bears the burden of showing that the child is delinquent or dependent before the state may wrest custody from a parent. *Id.* Between these poles lie custody disputes involving parents and third parties, such as grandparents. In *Ellerbe*, we acknowledged that in such cases the Court lacked legislative guidance regarding how to consider custody requests of third parties. *Id.* Thus, we adopted the standard developed by the Superior Court:

When the judge is hearing a dispute between the parents, or a parent, and a third party, ... [t]he question still is, what is in the child's best interest? However, the parties do not start out even; the parents have a "prima facie right to custody," which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

*Id.* at 514 (quoting and adopting the test set forth in *In re Hernandez*, 249 Pa.Super. 274, 376 A.2d 648, 654 (1977)).

Fifteen years later, in *Rowles v. Rowles*, 542 Pa. 443, 668 A.2d 126, 128 (1995), we again considered the weight that should be afforded parents' preferences in custody disputes with third parties. In that case, a plurality of this Court recommended that the *prima facie* requirement of *Ellerbe* be dropped and replaced with the recommendation set forth in then Justice Flaherty's concurring opinion in *Ellerbe:*

By clearly eliminating the presumption *per se,* and mandating that custody be determined by a preponderance of evidence, *weighing parenthood as a strong factor for consideration,* custody proceedings would be disentangled from the burden of applying a presumption that merely beclouds the ultimate concern in these cases: the determination of what affiliation will best serve the child's interests, including physical, emotional, intellectual, moral, and spiritual well-being.

*Rowles,* 668 A.2d at 128 (emphasis in original). Three justices joined the award of custody to the parent in *Rowles,* but voiced a strong opposition to dispensing with the presumption in favor of the parents and adopting the lower standard of merely considering parenthood as a "strong factor." *Id.* (Montemuro, J., concurring, joined by Zappala and Cappy, JJ.).

A few years later, in *B.A. v. E.E.*, we reaffirmed the presumption in favor of parents set forth in *Ellerbe:*

> Because the *Rowles* opinion did not command a majority of the court, the presumption that parents have a right to the custody of their children as against third parties remains in effect. Whether the parents' interest in their children is referred to as a presumption or as a factor to be weighed, however, the main idea is that parents are to receive special consideration: as the court put it in *Ellerbe*, special weight and deference should be accorded the parent-child relationship.

*B.A. v. E.E.*, 741 A.2d at 1229 n. 1; *see also Charles*, 744 A.2d at 1258. Thus, while the Court has considered other alternatives, we maintain a presumption in favor of parents that meaningfully tips the balance in the parent's favor.

▮ As previously mentioned, Father argues that, in addition to the requirements of Section 5311, grandparents must demonstrate that a child will suffer harm as a result of the denial of visitation or partial custody. The United States Supreme Court in *Troxel* refused to determine "whether the Due Process Clause requires all nonparent visitation statutes to include a showing of harm or potential harm as a condition precedent to granting visitation." *Troxel*, 530 U.S. at 73, 120 S.Ct. 2054. Moreover, while some of our sister states have required a finding of harm prior to a grant of visitation or partial custody either under the Due Process Clause or their own constitutions,[21] a number of courts have either declined to

21. The following courts have required a finding of harm before permitting a grant of custody or visitation to a third party: *Evans v. McTaggart*, 88 P.3d 1078 (Alaska 2004) (requiring clear and convincing evidence of parental unfitness or that the welfare of the child requires third party visitation); *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841, 858 (2002) (requiring a showing of "some other special factor such as harm to the child or custodial unfitness that justifies state interference"); *Roth v. Weston*, 259 Conn. 202, 789 A.2d 431 (2002) (requiring a showing of real and emotional harm to the child and a parent-like relationship with child); *Brooks v. Parkerson*, 265 Ga. 189, 454 S.E.2d 769 (1995) (finding statute unconstitutional and requiring a showing of harm prior to a grant of visitation); *Von Eiff v. Azicri*, 720 So.2d 510 (Fl.1998) (holding that state may not intrude on fundamental right of parents except where the child is threatened with harm); *Wickham v.*

require third parties to demonstrate harm or have found that grandparents may satisfy a requirement of harm merely by showing that the child will be harmed by the termination of a beneficial relationship with his or her grandparents.[22]   Addi-

*Byrne*, 199 Ill.2d 309, 263 Ill.Dec. 799, 769 N.E.2d 1 (2002) (permitting interference with parental rights only in limited instances to protect the health, safety, and welfare of the child); *In re Marriage of Howard*, 661 N.W.2d 183 (Iowa 2003) (declaring statute involving grandparent visitation after parental divorce facially unconstitutional due to statute's failure to require both a showing of parental unfitness and harm to the child beyond mere loss of a beneficial relationship to the grandparents); *Blixt v. Blixt*, 437 Mass. 649, 774 N.E.2d 1052, 1059 (2002), *cert. denied*, 537 U.S. 1189, 123 S.Ct. 1259, 154 L.Ed.2d 1022 (2003) (requiring a showing of harm to the child which would satisfy the requirement that there be a "compelling and legitimate State interest in mitigating potential harm to children in non-intact families, an area in which the State has been traditionally and actively involved."); *Moriarty v. Bradt*, 177 N.J. 84, 827 A.2d 203 (2003), *cert. denied*, 540 U.S. 1177, 124 S.Ct. 1408, 158 L.Ed.2d 78 (2004) (requiring preponderance of evidence that lack of visitation will cause harm to the health and welfare of the child); *Neal v. Lee*, 14 P.3d 547 (Okla.2000) (requiring showing of harm to child before state may interfere with parental decision); *Camburn v. Smith*, 355 S.C. 574, 586 S.E.2d 565 (2003) (requiring a showing either of parental unfitness or compelling circumstances such as significant harm to child in the absence of visitation not merely that child would benefit from visitation); *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn.1993) (requiring substantial danger of harm); *In re Pensom*, 126 S.W.3d 251 (Tex.Ct.App.2003) (requiring showing of parental unfitness or significant impairment to child's physical health or emotional well-being resulting from lack of visitation).

**22.**   The following courts either have not required a finding of harm or have found harm merely in the denial of visitation with the third party: *Jackson v. Tangreen*, 199 Ariz. 306, 18 P.3d 100 (Ct.App.2000), *cert denied*, 534 U.S. 953, 122 S.Ct. 351, 151 L.Ed.2d 265 (2001) (finding statute facially constitutional in that statute required consideration of parties motivation, historical relationships and amount of visitation requested); *Vibbert v. Vibbert*, 144 S.W.3d 292 (Ky.Ct.App.2004) (showing of harm unnecessary); *Galjour v. Harris*, 795 So.2d 350 (La.App. 1 Cir.) *writ denied*, 793 So.2d 1229(La.), *cert. denied*, 534 U.S. 1020, 122 S.Ct. 545, 151 L.Ed.2d 422 (2001) (upholding constitutionality of statute where parent is deceased, interdicted, or incarcerated without any further qualifications); *Rideout v. Riendeau*, 761 A.2d 291 (Me.2000) (upholding the constitutionality of the statute, noting the potential traumatic effect of cessation of the grandparent relationship on the child); *Moriarty v. Bradt*, 177 N.J. 84, 827 A.2d 203 (2003); *cert. denied*, 540 U.S. 1177, 124 S.Ct. 1408, 158 L.Ed.2d 78 (2004) (requiring preponderance of evidence that lack of visitation will cause harm to the health and welfare of the child, but stating that harm may be demonstrated by death of parent or dissolution of family); *Harrold v. Collier*, Nos.2004–1492, 2004–1647, 2005 WL 2483241, at *6 (Ohio Oct. 10,

tionally, our statute does not require a specific finding of harm, and our precedent militates against requiring grandparents to demonstrate harm as a condition precedent to a grant of visitation. Specifically, this Court has permitted non-biological parents to maintain or obtain primary custody of children over the objections of biological parents so long as there are other circumstances which "clearly indicate the appropriateness of a custody award to the non-parent." [23] *See Ellerbe*, 490 Pa. 363, 416 A.2d 512; *see also Rowles*, 668 A.2d at 128 (noting that in *Ellerbe* "all seven justices, agreed on several principles: 'the parent-child relationship should be considered to be of importance in determining which custody arrangement is in the child's best interest,' 'special weight' and 'deference' should be accorded the parent-child relationship, and the relationship should not be disturbed 'without some showing of harm' or unless circumstances 'clearly indicate the appropriateness of awarding custody to a non-parent' " (internal citations omitted)). Moreover, we conclude that requiring grandparents to demonstrate that the denial of visitation would result in harm in every Section 5311 case would set the bar too high, vitiating the purpose of the statute and the policy expressed in Section 5301, which is to assure the continued contact between grandchildren and grandparents when a parent is deceased, divorced, or separated. Instead, we conclude that the stringent requirements of Section 5311, as applied in this case, combined with the presumption that parents act in a child's best interest, sufficiently protect the fundamental right

2005) (holding grant of grandparent visitation warranted where grandparents had raised child for several years following the death of child's mother); *In re Marriage of O'Donnell–Lamont*, 337 Or. 86, 91 P.3d 721 (2004) (refusing to require showing of unfitness or harm prior to grant of custody to third party); *Brandon L. v. Moats*, 209 W.Va. 752, 551 S.E.2d 674 (2001) (finding due process concerns satisfied by statutory requirements that courts consider the best interests of the child and the effect of visitation on the parent-child relationship).

23. We acknowledge that third parties seeking visitation and custody must meet a stringent test for standing. *See T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913, 916 (2001) (noting that standing may be established either by invoking specific statutory authorization or by demonstrating that the petitioning party stands *in loco parentis* to the child).

of parents without requiring any additional demonstration of unfitness or specific requirement of harm or potential harm.[24]

The trial court in the case *sub judice* applied the necessary presumption and gave "special weight" to the decision of Father. Nevertheless, the court found that Grandmother had met this burden given the court's conclusion that the child benefited from spending time with Grandmother, with whom he had a longstanding and close relationship and from whom he received emotional support in the aftermath of the loss of his mother. We, therefore, find that the trial court satisfied the requirements of Section 5311 and that its application survives our strict scrutiny. Accordingly, the order of the Superior Court is affirmed.

Justice CASTILLE, SAYLOR and EAKIN join the opinion.

Former Justice NIGRO did not participate in the decision of this case.

Justice NEWMAN files a concurring opinion.

Chief Justice CAPPY files a dissenting opinion.

Justice NEWMAN concurring.

I join the well-reasoned Opinion of the Majority in this matter but write separately to indicate the strength of my

24. Unlike Mr. Chief Justice Cappy, we decline to demand a specific finding of harm by the trial court prior to a grant of partial custody in the case at bar. Moreover, we observe that consideration of harm resulting from the denial of grandparent visitation or partial custody is to some extent implicit in the statute because the statute is triggered only when a child has suffered the loss of a parent, and visitation or partial custody is allowable only when the court concludes that the grandparent relationship is in the best interests of the grieving child. It is beyond cavil that the child's loss of an additional beneficial relationship will result in some degree of harm. Nevertheless, we recognize that a demonstration of significant harm could certainly strengthen a grandparent's argument that visitation or partial custody is in the best interests of the child and acknowledge that the justification supporting a grant of visitation or partial custody should be correspondingly more convincing as the extent of the custody granted increases, because greater periods of custody present greater infringement on a parent's constitutional right to the direct the care, custody, and control of the child.

conviction that even greater forward movement in this area of children's rights is required. Security, continuity, and stability in an ongoing custodial relationship, whether maintained with a biologic or adoptive parent and/or with a grandparent is vital to the successful personality development of a child. The law finally needs to recognize that the child, as the focus in various types of proceedings, has the same inalienable rights to the pursuit of life, liberty, and happiness as an adult. Therefore, I write to emphasize that it is time to regard the best interests of the child as a fundamental and momentous right. Further, I am convinced that this Court needs to provide some guidance toward ascertaining a child's fundamental best interests.

Children are our most precious resource, and it is essential that they have a chance to be brought up in an environment where they are nurtured and given the chance to grow into law-abiding, productive members of the community. Children are vulnerable, impressionable, and in need of guidance and support. This is particularly true when a child experiences the loss of a parent. That support may spring from the child's relationship with a parent, a grandparent, a teacher, or a stranger, but will nearly always be provided by a parent or a grandparent. Situations like the instant matter in which a grandparent cares for a child during the parent's illness and is instrumental in preparing the child for the death of his or her parent are all too common. It is the emotional health of a child concomitant with the emotional bonds formed during childhood that determine whether the child ultimately becomes a productive member of the community.

## Development of Parental Rights

Historically, parents have maintained complete discretion over what caretakers to trust, what associations to encourage, and what role models to endorse. Pursuant to the early common law, children were the chattels of their parents, who could do as they wished with the child. Barbara Bennett Woodhouse, " 'Who Owns the Child?': Meyer and Pierce and the Child as Property," 33 Wm. & Mary L.Rev. 995, 1037

(Summer 1992) (hereinafter "Child as Property") (children were treated "as assets of estates in which fathers had a vested right. . . . Their services, earnings, and the like became the property of their paternal masters in exchange for life and maintenance.") (internal quotation marks omitted); *Hernandez v. Thomas,* 50 Fla. 522, 39 So. 641, 642 (1905) (holding mother's deathbed designation of the grandmother as a guardian for her children ineffective because only the father has the right of testamentary disposition and father had consigned the children to an orphanage); *Eustice v. Plymouth Coal Co.,* 120 Pa. 299, 13 A. 975 (1888) (ordering thirteen-year-old boy's wages paid directly to his parent). Early cases emphasized the right of the parent, superior to all others, to the care and custody of the child. *See, e.g., Norris v. Pilmore,* 1 Yeates 405 (Pa.1794) (suit by mother and master against clergyman for marrying minor child without her permission and against apprenticeship agreement); *Pease v. Burt,* 3 Day 485 (Conn. 1806) (noting that a parent has the right to control person of the child); *In re Deming,* 10 Johns. 483 (N.Y.1813) (holding that a man sentenced to life and subsequently pardoned resumes right to custody and control of his children); *Inhabitants of Dedham v. Inhabitants of Natick,* 16 Mass. 135, 1819 WL 1485, *4 (1819) (concluding that widow assumes the role as head of her family with all parental rights and children "cannot, by law, be separated from her"). This right could be dissolved only by abandonment, surrender, or unfitness. *See Stansbury v. Bertron,* 7 Watts & Serg. 362 (Pa.1844); *Moritz v. Garnhart,* 7 Watts 302 (Pa.1838); *see also In re Salter,* 142 Cal. 412, 76 P. 51, 52 (1904) (holding that court has no discretion to appoint grandmother as guardian of a child if father is not incompetent); *Harper v. Tipple,* 21 Ariz. 41, 184 P. 1005, 1006 (1919) (determining that child who lived over three years with the grandparents must be transferred to the custody of the father, absent a clear showing of incompetency).

This centralization of authority was a necessary function of state reliance on parents to raise their children to be functionally responsible citizens and to keep them from being a drain on state and municipal coffers. The belief was that, in order

to carry out these duties effectively, parents required the authority to act in the interest of their children without state interference. Further, the law presumed that the parent is able to display the maturity, wisdom, judgment, and experience that the child lacks. This doctrine of parental preference survives in a somewhat modified form in the presumption that a biologic parent will act in his or her child's best interests. *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion). "Procedure by presumption [, however] is always cheaper and easier than individualized determination." *Stanley v. Illinois*, 405 U.S. 645, 656–57, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). "But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child … [and][i]t therefore cannot stand." *Id.*

Although federal and state statutes do not identify parental rights, they do receive constitutional protection through the due process clause of the Fourteenth Amendment. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Although often expressed as a liberty interest, childrearing autonomy is rooted in the right to privacy. *Meyer* involved a Nebraska statute that prohibited the teaching of any foreign language to a child prior to the eighth grade. The Court held the statute unconstitutional stating that "[w]ithout doubt, [liberty] denotes not merely freedom from bodily restraint but also the right of the individual … to marry, establish a home and bring up children. … [I]t is the natural duty of the parent to give his children education suitable to their situation in life." *Id.* at 399–400, 43 S.Ct. 625. The Commonwealth relied on the reasoning of *Meyer* in *Commonwealth v. Bey*, 166 Pa.Super. 136, 70 A.2d 693 (1950).

In *Pierce*, the Court addressed a state statute that prohibited children from attending non-public schools. Again, the Court determined that the law "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing

and education of children under their control." *Pierce*, 268 U.S. at 534–35, 45 S.Ct. 571. In *In re William L.*, 477 Pa. 322, 383 A.2d 1228, 1232 n. 4 (1978), this Court observed that a statute "prescribing any particular mode of child rearing would likely be unconstitutional." Later, in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), the Court reaffirmed these principles in concluding that a statute requiring children to recite the Pledge of Allegiance over parental objection violated the parents' rights. These became the foundation cases for the federal theory of "family." However, as the Supreme Judicial Court of Maine articulated in *Rideout v. Riendeau:*

> The constitutional liberty interest in family integrity is not, however, absolute, nor forever free from state interference. The Due Process Clause is not an impenetrable wall behind which parents may shield their children; rather, it provides heightened protection against state intervention in parents' fundamental right to make decisions concerning the care, custody, and control of their children.

*Rideout v. Riendeau*, 761 A.2d 291, 299 (Me.2000) (internal citations omitted). But the state maintains an interest in the welfare of its children and may limit parental autonomy "if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *Accord Ex parte Crouse*, 4 Whart. 9, 1839 WL 3700 *2 (Pa.1839) (observing that when parents are incapable of fulfilling parental duties and responsibilities, the biologic parents can "be superseded by *parens patriae*").

## Development of Children's Rights

Although the common law assumed that parents had the duty and the authority to control the upbringing of their children, the state retained the power and the duty to protect those unable to protect themselves. *See, e.g., Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The government even occasionally superseded the rights of parents when in the government's best interest. *See, e.g.,*

*Commonwealth v. Barker,* 5 Binn. 423 (Pa.1813) (Congress can enlist minors without the consent of their parents). This doctrinal power originated from the authority of the king and is, of course, termed *parens patriae*. *Parens patriae* enabled the state to intervene when parents were unable or unwilling to provide adequate emotional and physical care for their children. *See Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). This Court recognized the doctrine of *parens patriae* as early as 1839 in *Crouse,* where the child's mother had committed the child to a workhouse because she felt the child was unmanageable. The father sought custody and a determination that the legislation permitting the Commonwealth to keep the child was unconstitutional. This Court propounded the *parens patriae* doctrine as the rationale by which the Commonwealth could accomplish child behavioral "reformation, by training [children] to industry; by imbuing their minds with principles of morality and religion; by furnishing them with means to earn a living; and, above all, by separating them from the corrupting influence of improper associates." *Crouse,* 4 Whart. 9, 1839 WL 3700 at *2. The seeds of the "best interests of the child" dogma were sown.

Traditionally, courts abhorred interference with parental decision-making, reasoning that such interference may undermine parental authority and hinder parents from fulfilling the legal and moral duties imposed by society. The child's best interests generally served as a tiebreaker in custody disputes between parents; nevertheless, they gave way in disputes between a parent and a third party. Nonetheless, sporadically, common law courts, such as that in *Crouse,* recognized exceptions to the blanket rule against interfering with parental autonomy. Thus, although not explicitly recognized as inalienable rights in some early cases, the rights of the child to have his or her best interests considered trumped the right of the parents to the companionship and control of their children. *See, e.g., Crouse, supra; Commonwealth v. Addicks,* 5 Binn. 520 (Pa.1815) (using best interests of the child over parental rights to decide child custody issues); *see also In re Waldron,* 13 Johns. 418 (N.Y.1816) (finding that it is in best interest of

the child to remain with grandfather rather than be placed in the care of father); *Legate v. Legate,* 87 Tex. 248, 28 S.W. 281, 282 (1894) (holding that "[t]he right of the parent or the state to surround the child with proper influences is of a governmental nature, while the right of the child to be surrounded by such influences as will best promote its physical, mental, and moral development is an inherent right, of which, when once acquired, it cannot be lawfully deprived.").

Gradually the concept of children as property became obsolete and judicial attitudes and approaches changed. *See, e.g., Chapsky v. Wood,* 26 Kan. 650, 1881 WL 1006, *1 (1881) ("[A] child is not in any sense like a horse or any other chattel, subject matter for absolute and irrevocable gift or contract."); "Child as Property," *supra*; Katharine T. Bartlett, "Re-expressing Parenthood," 98 Yale L.J. 293 (Dec. 1988). Although the remnants of the autonomy and supremacy of the parent to make life-determining decisions for a child remained, some courts adopted the position that parents are the trustees of the child's best interests. Even more significant was the recognition of specific children's rights, some of which reached constitutional magnitude.

## Development of Grandparents Rights

At early common law, grandparents lacked any substantive rights with regard to custody of their grandchildren. Even though, biologically, generations emerge telescopically, one out of the other, life expectancies of eighteenth and nineteenth century grandparents often prevented them from becoming active participants in the lives of their grandchildren. The "superior rights" of parents protected parental autonomy and the nuclear family, and negated the interests of grandparents and third parties.

Many commentators believe that the erosion of the nuclear family beginning in the 1960s spawned grandparent visitation statutes in all fifty states, thus challenging strict parental autonomy. *See, e.g.,* Jennifer Kovalcik *"Troxel v. Granville:* In the Battle Between Grandparent Visitation Statutes and Parental Rights, 'The Best Interest of the Child' Standard

Needs Reform," 40 Brandeis L.J. 803 (Spring 2002); Ellen Marrus, "Over the Hills and Through the Woods to Grandparents' House We Go: or Do We, Post–Troxel?", 43 Ariz. L.Rev. 751 (Winter 2001). Conversely, grandparent visitation and custody, although statutorily derived, has not risen to a level that enables inclusion within the purview of the Fourteenth Amendment's bundle of "liberty" rights.

As ably discussed by the Majority, the United States Supreme Court invalidated the Washington statute on an "as applied" basis because of its breadth and the failure of the Washington legislature to require due consideration for the rights of a fit parent to determine how his or her child will be raised and with whom that child will associate. The Pennsylvania grandparent custody and visitation statute does not suffer from these infirmities. The General Assembly has narrowly tailored Section 5311 [1] to limit grandparent standing to only those grandparents who have experienced the death of their own child and seek to maintain contact with the children of that deceased child. Further, the trial court is directed to consider the parent-child relationship, the best interests of the child, and the extent of the child-grandparent relationship before granting visitation or partial custody.

Grandparents, as important transmitters of family values, as representatives of family legacy, as mediators between parents and children, or as rescuers of families in difficulty, are important resources for society in neutralizing the damaging effects of divorce, death, or drug addition. This statutory expansion of grandparent rights seems to invite conflict as to when the state government, acting through a trial judge, may influence the resolution of an internal family dispute, rather than recognize the realities of modern society. In this vein,

---

1. Section 5311, 23 Pa.C.S. § 5311, states:

If a parent of an unmarried child is deceased, the parents or grandparents of the deceased parent may be granted reasonable partial custody or visitation rights, or both, to the unmarried child by the court upon a finding that partial custody or visitation rights, or both, would be in the best interest of the child and would not interfere with the parent-child relationship. The court shall consider the amount of personal contact between the parents or grandparents of the deceased parent and the child prior to the application.

one commentator complained, "If we collectively allow grand-parent visitation to be forced upon an unwilling family for no better reason than that some robed stranger thought it best, we have embarked upon a slow decent into judicial supervision of family life which has neither legal limits nor a logical end." Joan C. Bohl, "The "Unprecedented Intrusion": A Survey and Analysis of Selected Grandparent Visitation Cases," 49 Okla. L.Rev. 29, 80 (Spring 1996). However, with appropriate guidance and limited statutory authority, a trial court can weigh the facts in an individual case and provide a reasoned, intelligent, and fair disposition that does not descend to the level of "judicial supervision of family life."

On those occasions where courts granted grandparent visitation, the court usually focused on the facts of each case and awarded visitation or partial custody if the grandparents had a close relationship with the child and there was a disruption in the nuclear family. I believe that, in the twenty-first century, the state's interest in protecting a child's relationship with a third party, particularly a grandparent with whom the child has formed an attachment and benefited from a nurturing and caring association, has heightened because, in some instances, there is no intact or stable family to otherwise protect the child.

Interestingly, in *Meyer, Pierce, Barnette,* and *Yoder,* the challenge to parental rights came from the state, which tried to curtail parental child-rearing decisions in some manner. Grandparent visitation and partial custody cases, however, do not set the state against parental authority but instead mediate between a parent and the interested grandparent. Because of the limited reach of the Pennsylvania statute, this conflict is restricted to a parent and one grandparent or a parent and one set of grandparents.

## Best Interests as a Fundamental Right

"A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens...." *Prince,* 321 U.S. at 168, 64 S.Ct. 438. Accordingly, "[i]t is evident beyond the need for elaboration

that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling." *New York v. Ferber,* 458 U.S. 747, 756–57, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (internal quotation marks omitted). Hardly a more compelling State interest exists than to keep children safe from the kinds of physical or emotional trauma that may scar a child's health and physical, mental, spiritual, and moral development well into adulthood.

Much attention has been given to the fundamental right of parents to the care, custody, and control of their minor children. The primary justification for this parental preference principle, one that resounds within numerous decisions, is based on the constitutional considerations articulated in *Meyer, Pierce, Barnette,* and *Yoder.* A parent's superior right to custody of the child is an acknowledgment that parents and children have a recognized unique and legal interest in, and a constitutionally protected right to, each other's companionship. The parent has a right to raise the child, yet the child has a corresponding right to be raised by his or her parent. *See generally Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Thus, the rights of the parent and the child are ordinarily compatible for it is generally believed that it is in a child's best interest to be reared by its parent. Further, the liberty interests of parents protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution are also protected by the Constitution extant in this Commonwealth. However, it is not only parents who have a right to familial integrity and constitutional protection.

Article I, Section 1 of our Pennsylvania Constitution states that: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." The term "men" as used in this Article is generic for all natural persons. Minors are natural persons in the eyes of the law and, therefore, possess a constitutional right to liberty and the pursuit of happiness.

Because fundamental rights do not mature and come into being magically when one attains the state-defined age of majority, minors, along with adults, are protected by our Constitution and possess constitutional rights. *See, e.g., In Interest of Stephens,* 501 Pa. 411, 461 A.2d 1223 (1983) (determining that minors possess the constitutional right against placement in double jeopardy); *Commonwealth ex rel. Tabb v. Superintendent of Youth Study Ctr.,* 407 Pa. 466, 183 A.2d 317 (1962) (freedom from self-incrimination). Further, we have repeatedly held that this Article provides greater protection than that provided by the United States Constitution. *See, e.g., Commonwealth v. Nixon,* 563 Pa. 425, 761 A.2d 1151, 1156 (2000); *Theodore v. Delaware Valley Sch. Dist.,* 575 Pa. 321, 836 A.2d 76, 88 (2003).

In *In re William L.,* 477 Pa. 322, 383 A.2d 1228 (1978), a termination of parental rights case, we established that while the state generally may not enter into the private realm of family life and because parental rights must be accorded significant protection, the state as *parens patriae* has an affirmative duty to protect minor children. Thus, the restraint on state interference in family matters does not reach so far as to compel the courts to protect parental rights at the expense of ignoring the rights and needs of children. *Id.* at 1236.

Having decided that the statute was facially constitutional, the *William L.* Court took great care in applying the statute to the facts. It rejected the appellant's assumption that the purpose of the termination statute was to punish an ineffective or negligent parent and that therefore a finding of parental fault was constitutionally necessary before termination. Rather, the Court pointed out, inquiry should center upon the welfare of the child rather than the fault of the parent. The state's responsibility to protect its weaker members authorizes interference with parental autonomy and decision-making in appropriate circumstances. Justice Roberts in *William L.* set forth the moral and practical importance of this authority:

These cases do not, however, support the proposition that the state can never interfere in the parent-child relation-

ship. Indeed, in *Stanley v. Illinois*, supra, the United States Supreme Court recognized that the state had not only a right, but a duty to protect minor children. [*Stanley v. Illinois*,] 405 U.S. at 649, 92 S.Ct. at 1212. See also *Prince v. Massachusetts*, supra (upholding anti-child labor statute against challenge that it unreasonably infringed upon parent's and child's free exercise of religion and parent's right to educate child in her beliefs). Constitutional restraint on state interference in family matters does not compel the courts to protect parental rights at the expense of ignoring the rights and needs of children. In *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the United States Supreme Court rejected the argument that the state's interest in protecting parental authority justified giving parents a veto power over a minor's decision to have an abortion where the minor and the non[-]consenting parent are so fundamentally in conflict and the very existence of the pregnancy has already fractured the family structure.

*Id.* at 1235 (internal quotation marks omitted).

The fundamental rights of children to have their best interests considered prevails over the fundamental rights of parents to the care, custody, and control of their children in custody determinations between fit parents, in dependency and delinquency proceedings, and in proceedings to terminate parental rights. Although not explicitly stated in these past decades, I believe that Pennsylvania, for some considerable time, has treated the best interests of the child as a fundamental right.

It is on this basis that I advocate that we finally legitimize the right of the child to have his or her best interests considered as a fundamental right. This interest is expressed in a variety of statutes and proceedings, ranging from the complete severance of parental rights on a judge's finding of parental unfitness, to the limitation of parental choices in the areas, for example, of education, health care, and safety. Thus, I believe that the instant matter involves a situation that burdens two fundamental rights—the right of a fit father to

make parenting decisions for the child and the right of the child to have its best interests considered. Many cases, with their emphasis on the importance of family and personal associations, provide support for the view that a child has a due process right to maintain relationships with individuals other than his or her parents. Interestingly, Great Britain has come to terms with the fundamental rights of children. In *Lawrence v. Penbrokeshire County Council,* 2006 WL 1288355, at 38 EWHC 1029 (Queen's Bench Div.) (May 11, 2006), the House of Lords held that where "rights of parents and a child are at stake, the child's rights must be the paramount consideration. If any balancing of interests is necessary, the interests of the child must prevail."

Before turning to a balancing of these rights, I will briefly consider the form of relief that the grandmother seeks.

### Custody v. Visitation

Generally, the right of visitation is derived from the right of custody. There are essentially three types of custody arrangements—full custody, partial custody, and visitation. "The distinguishing elements of these arrangements are '[t]he length of existing visits, the frequency with which they occur, whose home the visits take place in, and who is in effective control of the [child] during the visit.'" *Commonwealth ex rel. Zaffarano v. Genaro,* 500 Pa. 256, 455 A.2d 1180, 1182 (1983) (quoting Note, "Visitation Rights of a Grandparent Over the Objection of a Parent: The Best Interests of the Child," 15 J. Fam. L. 51, 67 (1976–77)). Full custody denotes the care, control, and maintenance of a child including all physical and legal aspects of custody, and the child resides with the person to whom custody was awarded. *Black's Law Dictionary* 390 (7th ed. 1999).

Visitation normally represents a period of access by a non-custodial individual. It differs from full custody in that the child does not dwell with the non-custodial individual, and, although this individual can be responsible for the care and safety of the child, he or she may not make important decisions for the child. *Black's Law Dictionary* 1566 (7th ed.

1999). Full custody confers rights and authority upon the one in whom it is placed as opposed to the privilege of visiting. However, in Pennsylvania, visitation and partial custody have meanings somewhat peculiar to the Commonwealth. Here, visitation is limited to the opportunity to see the child wherever he or she might be, only in the presence of the custodial individual, and does not include the right to remove the child from that environment, even briefly. Partial custody is visitation with a child out of the presence of the custodial individual. *Zaffarano*, 455 A.2d at 1182 (citing *Scott v. Scott*, 240 Pa.Super. 65, 368 A.2d 288, 290 (1976)). It is because of this distinction, that the General Assembly amended the statute to permit grandparents to seek either visitation or partial custody or both.

### Standard of Review

Where fundamental rights are in conflict, we must apply a standard of judicial scrutiny that is properly sensitive to the individual interests on both sides. While I generally agree with the Majority that strict scrutiny must be applied to any infringement of a fundamental right, I would find that in matters such as that before us, the standard of review requires both strict scrutiny and a balancing of fundamental rights. Thus, in determining whether to grant visitation, trial judges must weigh the three competing interests of: the child, the parent, and the state. The interacting interests of the child, the parent, and the grandparents are shaped by societal perceptions of the definition of family. When considered together, the weight given and the value assigned to each of these interests form and define the appropriate standard to be applied.

In balancing the competing interests, I believe that the child is the paramount focus. The child has an interest in being cared for by an adult who will provide protection, companionship, and upbringing. Although the court may seek to determine the child's own views, the child's interest is often unavoidably defined by the views of the adult-spokesperson with whom the child currently resides.

The child's 'best interest' is also not controlled by whether the parent or the non-parent would make a 'better' parent, or by whether the parent or the non-parent would afford the child a 'better' background or superior creature comforts. Nor is the child's best interest controlled alone by comparing the depth of love and affection for the child by those who vie for his or her companionship. Instead, in ascertaining the child's best interest, the court must be guided by principles that reflect a considered social judgment. In this Commonwealth, those principles are subsumed within an extensive statutory scheme.

The parental interest is the next concern to be weighed by the trial judge. The parents' interest in the custody and companionship of the child has already achieved heightened legal significance and has been elevated to a fundamental right. The parental interest is a strong factor, but I believe that it still must accommodate the right of the child, as an individual, to have his or her best interests considered. Although third-party interests, the so-called external factors, may then be considered by the court only after resolving those interests that are fundamental. Often, non-parents, especially grandparents, form an emotional bond with the child. They may seek to perpetuate a continuing relationship with that child through visitation. Although they may sometimes enjoy a protected interest in the companionship of the child when standing *in loco parentis*, I agree that, within the legal landscape, the interests of the grandparents are entitled to little weight in comparison to the stronger interests of the parents and the children. Their greatest consideration only enters into a determination of the child's best interests.

Finally, the court must weigh the interest of the state in protecting the emotional and physical health of its minor citizens and ensuring their proper development. The broader form of the state, that is society, has concern relative to the form and function of the family unit. Society's interest in the family stems from the family's unique ability to teach children to care for one another, to develop a sense of community, and

to gain the knowledge that is essential for productive citizenship.

Each of these interests promotes a particular result. When considered together, I believe that the result of a contest between competing interests should be clear. Furthermore, I conclude that the interests, themselves, will determine the appropriate balance to strike. In the context of grandparent visitation, the parental interest predominates over the interest of the grandparents, and the consideration of the child's best interest is entitled to fundamental weight.

## Fundamental Rights Analysis

The Pennsylvania statute is of neutral application. There is no presumption contained within the statutory text that the best interest of the child will be promoted by any particular custodial disposition. The statute confers standing and sets the standard, and then the court balances the relative rights of the parties.

Our grandparent visitation statute is meant to protect children's well-being by providing for visitation when it is in their best interests. It also seeks to preserve the right of access of grandparents to their grandchildren under certain specific circumstances. In the declaration of policy preliminary to the grandparent custody and visitation statute, the:

> General Assembly declares that it is the public policy of this Commonwealth, when in the best interest of the child, to assure a reasonable and continuing contact of the child with both parents after a separation or dissolution of the marriage and the sharing of the rights and responsibilities of child rearing by both parents and continuing contact of the child or children with grandparents when a parent is *deceased,* divorced or separated.

23 Pa.C.S. § 5301 (emphasis added). The specific statutory section states:

> If a parent of an unmarried child is deceased, the parents or grandparents of the deceased parent may be granted reasonable partial custody or visitation rights, or both, to the unmarried child by the court upon a finding that partial

382

custody or visitation rights, or both, would be in the best interest of the child and would not interfere with the parent-child relationship. The court shall consider the amount of personal contact between the parents or grandparents of the deceased parent and the child prior to the application.

23 Pa.C.S. § 5311.

The competing constitutional rights of parent and child must be evaluated in light of the government's position within these areas of conflicting interests. Further, the Commonwealth has a legitimate concern in aiding in the parental discharge of the primary and fundamental duties and responsibilities of the family with regard to child welfare and safety. The state has a definite and discrete interest in the safety and welfare of children and exercises this responsibility in a number of different ways. Also, this Court requires that, when competing fundamental constitutional interests are presented, or multiple constitutional concepts face conflict, we must search for harmony to provide each a field of operation.

We have previously given voice to the benefits of the intergenerational relationship between grandparents and grandchildren.

[Children] ... have the natural right to know their grandparents and ... benefit greatly from that relationship. Grandparents give love unconditionally-without entanglement with authority or discipline, and often without pressures of other burdensome responsibilities. Children derive a greater sense of [worth] from grandparental attention and better see their place in the continuum of family history. Wisdom is imparted that can be attained nowhere else. The benefits derived by a [child] from the society of his or her grandparents have frequently been touched upon by psychologists and psychiatrists.... They are substantial benefits and should not be lightly regarded by our judicial system.

*Bishop v. Piller,* 536 Pa. 41, 637 A.2d 976, 978–79 (1994) (internal footnote omitted). As ably recognized by one of our sister states:

Moreover, the importance of the grandparent-grandchild relationship in the lives of children has been confirmed. *See* [Chrystal C. Ramirez Barranti, *The Grandparent/Grandchild Relationship: Family Resource in an Era of Voluntary Bonds*, 34 Family Relations 343,] 346–47 [(1985)] (describing studies by Baranowski, Kornhaber and Woodward, and Mead in support of that contention).

> The emotional attachments between grandparents and grandchildren have been described as unique in that the relationship is exempt from the psycho-emotional intensity and responsibility that exists in parent/child relationships. The love, nurturance, and acceptance which grandchildren have found in the grandparent/grandchild relationship confers a natural form of social immunity on children that they cannot get from any other person or institution.

Commentators have suggested that, in the absence of a grandparent/grandchild relationship, children experience a deprivation of nurturance, support, and emotional security. Indeed, Kornhaber and Woodward posited that the complete emotional well-being of children requires that they have a direct, and not merely derived, link with their grandparents. Mead advanced the notion that when an individual does not have intergenerational family relationships there is a resulting lack of cultural and historical sense of self.

*Moriarty v. Bradt*, 177 N.J. 84, 827 A.2d 203, 210–11 (2003) (internal citations and quotation marks omitted).

Indeed, the decisional law makes it clear that such a benefit is not limited to the parent-child nuclear family. For example, in *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), the Supreme Court invalidated an ordinance limiting occupancy in a dwelling to certain members of a family unit as it applied to a grandmother living in her home with her two grandsons, who were cousins and not siblings. In his plurality opinion, Justice Powell argued that the *Yoder, Meyer,* and *Pierce* line of cases applied to extended family relationships, even though those decisions had not

involved such associations. Extolling the virtues of the extended family, Justice Powell stated:

> [M]illions of our citizens have grown up in just such an environment, and most, surely, have profited from it. Even ... a decline in extended family households ... [has] not erased the accumulated wisdom of civilization, gained over the centuries and honored throughout our history, that supports a larger conception of the family. Out of choice, necessity, or a sense of family responsibility, it has been common for close relatives to draw together and participate in the duties and the satisfactions of a common home.... Especially in times of adversity, such as the death of a spouse or economic need, the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life.

*Id.* at 504–05, 97 S.Ct. 1932.

In *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635, 640 (1977), where we overruled the "tender years" presumption that custody should be awarded to mothers rather than fathers, we stated: "Courts should be wary of deciding matters as sensitive as questions of custody by the invocation of 'presumptions'. Instead, we believe that [our] courts should inquire into the circumstances and relationships of all the parties involved and reach a determination based solely upon the facts of the case then before the Court." I believe that the same reasoning should apply where the custody dispute is between parents and third parties.

The General Assembly has directed the focus of the grandparent custody and visitation statute to the fundamental right of the best interests of the child. The courts of the Commonwealth have routinely focused on the best interests of the child in custody and visitation cases, while still recognizing the fundamental right of parents to raise the child. *See Bishop*; *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980); *Zaffarano*; *Miller v. Miller,* 329 Pa.Super. 248, 478 A.2d 451 (1984); etc. Pursuant to the Pennsylvania Constitution, the child has a fundamental right to have his or her best interests considered. In balancing the fundamental rights of parents and children,

there is no single overriding factor; rather, courts should consider every fact relevant to the physical, emotional, intellectual, moral, and spiritual well-being of a child. Parenthood, though not paramount, will always be a factor of significant weight.

## Child's Best Interests

Courts should consider all relevant factors and specific circumstances of the actual parties involved. Therefore, in determining a child's best interests, the trial judge may consider such factors as: (1) the amount of disruption extensive visitation would cause in the child's life; (2) the suitability of the grandparents' home with respect to the amount of supervision received by the child; (3) the emotional ties between the child and the grandparents; (4) the moral fitness of the grandparents; (5) the distance between the child's home and the grandparents' home; (6) the potential for the grandparents to undermine the parent's general disciplining of the child as a result of visitation; (7) whether the grandparents are employed and the responsibilities associated with such employment; (8) the amount of hostility that exists between the parent and the grandparents; and (9) the willingness of the grandparents to accept the fundamental concept that the rearing of the child is the parent's responsibility and is not to be interfered with by the grandparents.

In addition, the trial court should determine whether the child's emotional health will benefit from re-establishment of the grandparent-child relationship. Was the grandparent, as in this case, an important resource for the child in coping with the death of the parent? Other factors could include: (1) whether the child's performance in school suffered following the death of the parent; (2) whether the child has interests outside of school and home that would be advanced or supported by grandparent participation; (3) the closeness of the child to other members of the deceased parent's family and the opportunity to maintain that relationship without the presence of the grandparent in the child's life; and (4) the child's wishes.

### Requirement of Harm

Experience has taught us the lesson that the parental relationship is not an infallible guarantee that a parent will provide the care and concern essential to a child's proper development. In such cases, the General Assembly has established guidelines and procedures that permit state-enforced custody only when a child is found delinquent or dependent as defined by law, or in cases of abuse, deprivation, or neglect. Thus, the extreme solution of termination of parental rights rests on a demonstration of unfitness of a parent or upon harm to the child.

At the other end of the custody spectrum is the clash between the child's parents and the inevitable dissolution of the family that attends ·a custody dispute between husband and wife. These disputes have long been guided by the controlling direction to award custody consistent with the best interests of the child.

The middle ground, where a third party seeks partial custody and where there is no state-enforced custody, does not demand the stringent harm-to-the-child standard for resolution. I believe that it requires the delicate balancing of fundamental rights.

*Troxel* specifically declined to address the so-called "harm" standard, and it also failed to articulate an "inadequate care" requirement. Rather, the due process right that the Supreme Court affirmed in *Troxel* is important but limited: a court may not override a parent's decision about the care or custody of a child simply because the court determines that the decision is not in the child's best interest, as the trial court did in *Troxel* regarding a grandparent's interest in visitation. Instead, the court must presume that a fit parent's decision is in the best interest of the child, and the court may reach a decision contrary to the wishes of the parent only if there is evidence sufficient to overcome that presumption. *Troxel* goes no further. I am inclined to believe that the *Troxel* plurality would have used stronger language if it thought that parental

discretion may *only* be outweighed upon a showing of harm to the child.

*Troxel* does require the state to give "some special weight" to the interest of a parent in decisions regarding a child. *Troxel v. Granville*, 530 U.S. 57, 73, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion). However, the Pennsylvania statute as the Majority applies it here, responds to that mandate and appropriately protects the father's due process rights. Father received the deference to his due process rights that *Troxel* requires.

Therefore, I cannot adopt the assertion of the Dissent that some showing of harm to the child must be shown before the courts can implement the Act. That contention ignores the state's legitimate interest in the welfare of the child.

## Conclusion

Legal proceedings immutably alter children's lives; when this occurs, their interests must be paramount for they cannot protect themselves. We strictly construe the application of parental rights statutes because of the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children. I am convinced that this compelling state interest is grounded on the fundamental right of the child to have his or her best interests considered. It is also based on the state's *parens patriae* responsibility, which tips the balance of the fundamental rights of parent and child in favor of the fundamental right of the child. Those competing interests are no less compelling when the conflict involves an interest asserted by a grandparent.

Our decision here must perforce be guided by our duty to promote sound public policy and preservation of rights. In the current state of our society, we should interpret the laws of our Commonwealth in such a way that adheres to the mandates of our legislature and promotes the best interests of children in stable families, immediate or extended, that can provide nurturing and supportive homes. Our legislature has spoken on the rights of grandparents to visitation and partial

custody of their grandchildren under limited conditions. Our duty is to implement the law accordingly.

Because grandparent visitation is temporary and occasional, the resulting intrusion upon parental authority is minimal. By all accounts, the father in this case has a very close relationship with his son and I cannot see that this child's spending a reasonable amount of time with his grandmother will adversely affect his relationship with his father. Grandparent visitation is a social policy issue more appropriately left to the General Assembly, which has the ability to hold public hearings and debates, to examine the issue, and to draft appropriate legislation addressing the rights and balancing the interests of the various parties involved. That is precisely what the Legislature did in enacting the grandparent custody and visitation statute.

Chief Justice CAPPY dissenting.

In my view, the trial court unconstitutionally applied Pennsylvania's grandparent partial custody and visitation statute, 23 Pa.C.S. § 5311, in this matter. I, therefore, respectfully dissent.

I begin by noting three principles espoused by the Majority with which I agree. First, under the Due Process Clause, parents do enjoy the constitutionally protected fundamental right to make decisions concerning the care, custody, and control of their children. *See* Majority Opinion at 358–59, 904 A.2d at 885. Second, because the trial court infringed upon Appellant Shane Fausey's ("Father") fundamental right to make decisions concerning the custody of his son Kaelen, the trial count's actions taken pursuant to 23 Pa.C.S. § 5311 must survive strict scrutiny. *Cf. id.* at 358–59, 904 A.2d at 885. Third and lastly, in order for the trial court's actions taken pursuant to Section 5311 to survive strict scrutiny, its actions must promote a compelling state interest and be narrowly tailored to effectuate that interest. *See id.* Unlike the Majority, these principles lead me to conclude that the trial court unconstitutionally applied Section 5311 in this matter.

The state undoubtedly has a compelling interest in protecting the health and emotional welfare of children. That said, unless a court finds that a fit parent's decisions regarding a child's contact with a grandparent is causing or will cause harm to the child, the state's interest in protecting the child's welfare is not implicated.

Here, the trial court did not determine that Father's decisions regarding Kaelen's contact with Ms. Hiller were harming or would harm Kaelen's welfare, and thus, the state's compelling interest in protecting Kaelen's welfare was not implicated. Rather, the court found Father to be a fit parent but nevertheless concluded that Ms. Hiller presented sufficient evidence to rebut the presumption that Father's decisions regarding Kaelen's contact with Ms. Hiller are in Kaelen's best interest and, based on this finding, granted Ms. Hiller partial custody.[1] By acting in this manner, the court supplanted Father's constitutionally protected decision to limit or preclude contact between Kaelen and Ms. Hiller. In place of Father's constitutionally protected decisions, the court injected its and Ms. Hiller's ideas of Kaelen's best interests. The state simply has no compelling interest to interfere with a fit parent's fundamental right to make decisions regarding a child's contact with a grandparent simply because the grandparent or anyone else, including a state court, thinks that a different decision is better or more desirable for the child. *See Troxel v. Granville*, 530 U.S. 57, 72–73, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality) ("[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made."). Because the state had no compelling interest in interfering with Father's decisions regarding Kaelen's contact with Ms. Hiller, the trial court's

1. I note that the trial court did not state what evidentiary standard of proof it applied in determining that Ms. Hiller sufficiently rebutted this presumption. Other than mentioning that the trial court gave "special weight" to Father's decision regarding Kaelen's contact with Ms. Hiller, the Majority does not address this apparent error. Moreover, in my view, the Majority does not fully explain what "special weight" is in this context or how a court is to give "special weight" to a parent's decisions.

application of 23 Pa.C.S. § 5311 does not survive strict scrutiny.[2]

In my view, due process requires that a court must make a threshold finding that a fit parent's decisions concerning his or her child's contact with a grandparent are causing or will cause the child harm before the court can infringe upon these constitutionally protected decisions. I would place the burden of proving such harm on the grandparent. Given the fundamental nature of the constitutional right involved in these types of cases and the presumption that a fit parent acts in the best interest of his or her child, see *Troxel*, 530 U.S. at 68, 120 S.Ct. 2054, I would require a grandparent to demonstrate, by clear and convincing evidence, that absent an order granting the grandparent custody and/or visitation, the child is being or will be harmed. See *Santosky v. Kramer*, 455 U.S. 745, 754–57, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (discussing standards of proof, and stating, among other things, that the clear and convincing evidence standard is appropriate "when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money' "). If a grandparent is able to meet this standard of proof, then the trial court must craft an order that is narrowly tailored to protect the welfare of the child. Only then is a court's infringement upon a fit parent's right to make decisions regarding his or her child's contact with a grandparent constitutional.[3]

**2.** Because I believe that no compelling state interest is implicated in this matter, I need not express my thoughts as to whether the trial court order is narrowly tailored. I, however, respectfully note my disagreement with the Majority's scrutiny under the narrowly tailored prong of its analysis. Most importantly, this is an "as applied" constitutional challenge and not a "facial" constitutional challenge. Therefore, the proper focus of our scrutiny should be on whether the Commonwealth's action taken pursuant to 23 Pa.C.S. § 5311—i.e., the trial court order—is narrowly tailored to promote the state's compelling interest. Our focus should not be on whether Section 5311 is, itself, narrowly tailored. See, e.g., Majority Opinion at 360–61, 904 A.2d at 887.

**3.** I find it important to note that, in my view, this construct promotes the best interest of the child. On the one hand, if a grandparent is unable to demonstrate harm in cases such as this, the court may not interfere with the parent's decisions. What is left is a fit parent who is

Lastly, I wish to express that I am not insensitive to Ms. Hiller's wish to foster her relationship with Kaelen. Under the circumstances presented in this matter, however, the Constitution of the United States protects Father's decisions concerning Kaelen's contact with her. In this vein, I find the following thoughts shared by Justice O'Connor in her plurality opinion in *Troxel* to be pertinent:

> In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance.

*Troxel,* 530 U.S. at 70, 120 S.Ct. 2054.

For these reasons, I would reverse the order of the Superior Court.

presumed to act in the child's best interests. On the other hand, if a grandparent adequately demonstrates harm, then the court is left with the task of drafting an order which is narrowly tailored to protect the welfare of the child. Such an order, by its very nature, promotes the best interest of the child.