J-S48043-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| R.T. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| J.T. | |
| Appellant | |
| v. | |
| C.V. | |
| | No. 570 WDA 2015 |

Appeal from the Order of March 18, 2015
In the Court of Common Pleas of Beaver County
Civil Division at No.: 11560-2014

BEFORE:  PANELLA, J., DONOHUE, J., and WECHT, J.

MEMORANDUM BY WECHT, J.:                    **FILED JULY 24, 2015**

J.T. ("Mother") appeals the March 8, 2015 order that granted primary physical custody of G.A. ("Child"), born in May 2009, to Mother and partial physical custody to R.T. ("Grandmother").  We vacate and remand with instructions.

The trial court summarized the factual history as follows:

[The appellant] in this action is [Mother], age 27, the natural mother of [Child].  Mother now lives in Allison Park, Pennsylvania, having relocated there in September of 2014.  For the first 26 years of her life she resided with her mother[, Grandmother]. . . .  [Grandmother] resides in Beaver County, Pennsylvania.

[Child] was born while [Mother] was living with [Grandmother.] The evidence reflected that the natural father of [Child, C.V. ("Father"),] has played no part in [Child's] life to this date.  It

should be noted that [Father] did not appear for any of the proceedings leading up to the trial and was not present during the trial.[1] [Mother] and [Father] were never married[,] have never resided together and have had virtually no relationship since the birth of [Child].

The evidence further reflected that [Mother] was the primary caregiver of [Child], but she also worked at a casino in Pittsburgh and would be away from [Grandmother's] residence for significant periods of time for purposes of work and also spent overnights after work with her present fiancé, with whom she now lives. When [Mother] was not available, [Grandmother] took over the caretaking responsibilities for [Child], even to the extent of taking [Child] to work with her as confirmed by testimony by her employer, a veterinarian. From that testimony, it appeared that [Child] was a regular at [Grandmother's] work and well-liked and encouraged to be there by the employer. The testimony also reflected that [Grandmother] would handle other responsibilities for [Child] such as doctors' visits and matters at pre-school/school.

The testimony clearly revealed that [Mother] had no problem permitting [Grandmother] to watch and care for [Child] up until the fall of 2014. In September of 2014, [Mother] and [Child] left [Grandmother's] residence. [Mother] claimed that she was forced out of the residence by [Grandmother,] while [Grandmother] testified that [Mother] left with [Child] to live with her fiancé.

Trial Court Opinion ("T.C.O."), 4/23/2015, at 2-3 (footnote omitted).

On October 16, 2014, Grandmother filed a complaint for partial custody of Child. Following custody conciliation, the hearing officer entered a proposed custody order granting Grandmother partial custody on December 12, 2014. Both Mother and Grandmother filed exceptions to the order.

_____

[1] Father also did not participate in this appeal.

The court held a custody trial on March 17, 2015. At trial, Mother testified that, since September 2014, she has livied with her fiancé, K.B., and Child. Notes of Testimony ("N.T."), 3/17/2015, at 9. Mother and K.B. had a son, E.B., approximately six weeks prior to trial. *Id.* at 10. Mother testified that she and Grandmother tried to get along when Child was younger and that Grandmother helped with Child. However, Mother asserted that the relationship between Mother and Grandmother became hostile and Grandmother was verbally abusive. *Id.* at 13. Mother testified that Grandmother kicked Mother and Child out of the house in September 2014. *Id.* at 12.

When Mother returned to work after having Child, Mother worked evening hours and Grandmother watched Child. *Id.* at 58-59. Mother admitted to spending the night with K.B. after work two or three times per month while Grandmother cared for Child. *Id.* at 60. Although Grandmother watched Child for twenty to thirty hours per week while Mother worked, Mother did not like some of Grandmother's behavior around Child. *Id.* at 16-18. Mother was concerned that Grandmother would bathe with Child and would allow Child to swim in the pool without a bathing suit. *Id.* at 17, 18. Grandmother also spanked Child against Mother's wishes. *Id.* at 20.

Mother alleged that Grandmother sold prescription medicine and grew marijuana at the home. *Id.* at 20, 22, 23. Mother also stated that she dated J.K. for six months in 2005, and then Grandmother dated J.K. off and

on from 2005 through at least September 2014. *Id.* at 26-27. Mother stated that Grandmother becoming involved with J.K. caused problems with Mother and Grandmother's relationship. *Id.* at 27. Mother was also concerned about J.K. because he used drugs in the home. *Id.* at 33. Grandmother has guns in the home that were left loaded and were not in a locked cabinet. *Id.* at 29-30. Mother admitted that she also owns a gun. *Id.* at 67. Mother's brother, Ro.T., also lives with Grandmother, and Mother alleged that he uses drugs and is physically and verbally abusive. *Id.* at 34-36.

Mother testified that, since overnight visits with Grandmother began, Child has had issues with the sleeping arrangements, and Grandmother feeds Child food that Mother does not permit her to eat. *Id.* at 46-47. Child has been defiant upon returning from Grandmother's house. *Id.* at 48-49. Further, Grandmother will not communicate with Mother regarding Child. *Id.* at 48.

K.B. testified that Grandmother and Mother had "a broken relationship," and that Grandmother was demeaning to Mother. *Id.* at 76. K.B. believed that Grandmother loved Child, but thought that Grandmother said inappropriate things to Child. *Id.* at 78-79. K.B. stated that Child likes to go to Grandmother's house but does not like to sleep there. *Id.* at 84. K.B. also noted that Child seems less engaged with the family when she returns from Grandmother's house. *Id.* at 85. K.B. and Mother started the

paperwork for K.B. to adopt Child, but were still in the process of trying to get Father to relinquish his parental rights. *Id.* at 86-87.

Grandmother testified that only she and Ro.T. live in her residence. *Id.* at 105. After Mother went back to work after having Child, Mother and Grandmother agreed that Mother would work nights and weekends because Grandmother worked during normal business hours during that week. With that schedule, someone would always be home with Child. *Id.* at 107. Grandmother took Child swimming and on trips with her two other grandchildren who live in the area. *Id.* at 108. Grandmother also took Child to work when Mother was unavailable during weekdays or when Mother was sleeping after a late shift. *Id.* at 108-09. Grandmother testified that she took Child to some dentist and pediatrician visits. *Id.* at 109. Grandmother described herself as "the other parent" and stated that she and Mother discussed how Child would be raised. *Id.* at 125.

Grandmother testified that the guns in her home are not loaded and that she keeps them in a cabinet, but that the children cannot access the cabinet. *Id.* at 112, 134-35. Grandmother denied that J.K. was living in her house and stated that she had not seen him since before Mother left the house. Grandmother testified that she knew that her relationship with J.K. could strain her relationship with Mother. *Id.* at 145. Grandmother admitted that J.K. used drugs, but stated that her relationship with him ended in 2010, although he still occasionally came around the house through

early 2014. *Id.* at 146-47. Grandmother denied that she grew marijuana or sold prescription drugs. *Id.* at 117-18.

Grandmother also denied that she kicked Mother and Child out of the house. *Id.* at 130. Grandmother admitted that she argues with Mother, and sometimes the arguments become heated. *Id.* at 131. Grandmother denied calling Mother names or disparaging Mother in front of Child. *Id.* at 132. Grandmother also argues with her son on occasion, but not in front of Child. *Id.* at 136-37.

Grandmother testified that the first scheduled visit was not an overnight visit as ordered. Instead, Mother offered to bring Child to a restaurant to meet with Grandmother and Mother stayed during the visit. Although Child was hesitant at first, Grandmother thought the visit went well. *Id.* at 118-19. At the second visit, K.B. notified Grandmother that the visit had to start Friday instead of Saturday as ordered. *Id.* at 121. Grandmother testified that the visit went well and that she and Child played games. *Id.* at 121-22. At the third visit, Child was excited to see Grandmother and was able to spend time with Child's cousins. *Id.* at 123.

F.S., Grandmother's daughter and Mother's half-sister, testified that she and her daughter are at Grandmother's house at least once per week. *Id.* at 158. F.S. observed Grandmother and Child and believed their relationship to be that of a typical family. *Id.* at 159. F.S. was present for part of two overnight visits between Grandmother and Child. She thought Child was more reserved than usual, but that Child loved Grandmother and

had a good time. *Id.* at 160-61. F.S. admitted that sometimes family members argued and yelled. *Id.* at 162-63. However, F.S. had no concerns about her daughter or Child being in the house. *Id.* at 163.

Grandmother's employer, Richard Bell, a veterinarian, testified that Grandmother brings Child to work, and that he knew Child and Grandmother well. Grandmother has worked for Mr. Bell since 1997. *Id.* at 98. He characterized Grandmother and Child's relationship as normal for a grandparent and grandchild. *Id.* at 99. Mr. Bell noted that Child was at the workplace frequently and, although he initially was reluctant, he believed it was necessary and permitted Child to be there. He also testified that Child liked being in the office and playing with the animals. *Id.* at 100.

After hearing all the evidence, the trial court discussed its findings of fact and conclusions of law on the record and gave its ruling from the bench. On March 18, 2015, the trial court issued its order, memorializing the prior day's ruling. The order awarded legal custody and primary physical custody to Mother. Father was granted partial custody, as he and Mother agreed. Grandmother was awarded partial physical custody on the second weekend of every month; one day during the Christmas, Thanksgiving, and Easter holidays; and ten consecutive days between June and August. Grandmother received a total of thirty-seven days each year.

On April 1, 2015, Mother filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On April 23, 2015, the trial court filed its opinion.

Mother raises six issues for our review:

I.     Whether the Court erred in granting partial custody to [Grandmother] over the objection of a fit parent when [Mother] has a fundamental constitutional right to the custody, care and control of her child.

II.    Whether the Court erred when considering the Pennsylvania § 5328 custody factors, it failed to heavily weigh those factors in the favor of [Mother] in a custody dispute between the natural mother and the maternal grandmother.

III.    Whether the Court erred by failing to consider the impact on the parent-child relationship when awarding partial custody to [Grandmother].

IV.    Whether the Court erred when it failed to give weight to the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.

V.    Whether the Court erred when [Grandmother] failed to prove that obtaining partial custody of [Child] was in the best interest of [Child].

VI.    Whether the remarks of the trial court judge regarding [Mother] established an appearance of impropriety such that the decisions regarding custody were the result of bias.

Mother's Brief at 3.

Mother's last issue is waived. It was not included in Mother's concise statement. *See* Pa.R.A.P.1925(b); ***Ravitch v. Pricewaterhouse***, 793 A.2d 939, 944 (Pa. Super. 2002) ("Failure to include an issue in a 1925(b) statement waives that issue for purposes of appellate review."). Therefore, we will not review that issue.

Mother first challenges the trial court's grant of partial custody to Grandmother. Mother suggests that the grandparent custody statute is

unconstitutional when applied to a grandparent seeking custody against the wishes of his or her own child, as opposed to a grandparent disputing custody with his or her grandchild's other parent. Mother recognizes that our Supreme Court found the statute's predecessor to be constitutional, but argues that the ruling should be limited to the facts of that case in which the maternal grandmother sought partial custody from the grandchild's father. Mother's Brief at 9-13.

Mother cites 23 Pa.C.S.A. § 5311. That statute was repealed, effective January 24, 2011, and was replaced by the following:

> In addition to situations set forth in section 5324 (relating to standing for any form of physical custody or legal custody), grandparents and great-grandparents may file an action under this chapter for partial physical custody or supervised physical custody in the following situations:
>
> (1) where the parent of the child is deceased, a parent or grandparent of the deceased parent may file an action under this section;
>
> (2) where the parents of the child have been separated for a period of at least six months or have commenced and continued a proceeding to dissolve their marriage; or
>
> (3) when the child has, for a period of at least 12 consecutive months, resided with the grandparent or great-grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, an action must be filed within six months after the removal of the child from the home.

23 Pa.C.S.A. § 5325.[2]

In **Hiller v. Fausey**, 904 A.2d 875 (Pa. 2006), our Supreme Court addressed whether now-repealed section 5311 violated a parent's due process rights. In that case, the maternal grandmother and the child had a close relationship prior to the mother's death. The grandmother saw the child almost daily in the two years during which the mother had cancer. The grandmother cared for the child when the mother was unable to do so or had doctors' appointments and transported the child to and from school occasionally. After the mother's death, the father cut off contact and the grandmother only saw the child on three occasions in the year after the mother died. **Id.** at 877.

The grandmother filed for partial custody. After a hearing, the trial court granted the grandmother's request and awarded her one weekend per month and a week in the summer. In doing so, the trial court applied the presumption that, as a fit parent, the father was acting in the child's best interest and that the grandmother had the burden of proof. The trial court

_____

[2] Section 5325 consolidated the three prior statutes that provided grandparents with standing to pursue custody under the prior statutory scheme: 23 Pa.C.S.A. § 5311 (providing grandparent standing when the grandparent's child was deceased); § 5312 (when the parents were divorced or separated); and § 5313 (when the child lived with the grandparent for at least twelve months). The previous sections each included a requirement that grandparent custody or visitation must be in the child's best interest and must not interfere with the parent-child relationship. That requirement can now be found in 23 Pa.C.S.A. § 5328(c).

considered the frequent contact between the child and the grandmother and their strong relationship. *Id.* at 877. The trial court considered that the father was unlikely to permit continuing contact without a court order. The trial court found that partial custody for the grandmother was in the child's best interest, notwithstanding the presumption that the father's decision to limit contact was in the child's best interest. *Id.* at 878. Finally, the trial court weighed whether partial custody would interfere with the parent-child relationship and found that partial custody would not distress the child or adversely impact the father's ability to parent the child. Therefore, the trial court concluded that the grandmother had rebutted the presumption that the father's decision to limit contact was in the child's best interest. *Id.* at 879.

Our Supreme Court affirmed that "the right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental rights protected by the Due Process Clause," and that court must apply strict scrutiny. *Id.* at 885-86 (defining strict scrutiny as determining "if the infringement is supported by a compelling state interest and if the infringement is narrowly tailored to effectuate that interest"). The Court identified the compelling state interest as "the state's longstanding interest in protecting the health and emotional welfare of children." *Id.* at 886. The Court also noted that the section 5311 was narrowly tailored, applying only to grandparents whose children had died. The statute furthered the policy interest of permitting continuing contact with

- 11 -

grandparents "when the parent is deceased, divorced, or separated." *Id.* Further, it recognized that "grandparents have assumed increased roles in their grandchildren's lives and our cumulative experience demonstrates the many potential benefits of strong inter-generational ties." *Id.* While the Court recognized that a grandparent's desire for partial custody would not override a fit parent's decision to limit contact in all cases, it refused to close the courtroom doors to a grandparent when the parent chose to limit contact. *Id.* at 887.

The *Hiller* Court also observed that, in addition to the language of the statute, our precedent had established "a presumption in favor of a fit parent." *Id.* at 887. The Court noted that the United States Supreme Court had found a Washington statute on third-party standing in custody unconstitutional due in part to the statute's failure to provide such a presumption. *Id.* (discussing *Troxel v. Granville*, 530 U.S. 57, 68-70 (2000)). In reviewing precedent, the *Hiller* Court stated that it had "maintain[ed] a presumption in favor of parents that meaningfully tips the balance in the parent's favor." *Id.* at 888.

In conclusion, the *Hiller* Court held:

[T]he stringent requirements of Section 5311, as applied in this case, *combined with the presumption that parents act in a child's best interest*, sufficiently protect the fundamental right of parents without requiring any additional demonstration of unfitness. . . . *The trial court in the case sub judice applied the necessary presumption and gave "special weight" to the decision of [the father]*. Nevertheless, the court found that [the grandmother] had met this burden given the court's consideration that the child benefited from spending time with

> [the grandmother], with whom he had a longstanding and close relationship and from whom he received emotional support in the aftermath of the loss of his mother. We, therefore, find that the trial court satisfied the requirements of Section 5311 and that its application survives our strict scrutiny.

*Id.* at 890 (emphasis added).

The statute at issue in **Hiller** only provided standing for the parent of a deceased parent. At that time, a different statute, not considered in **Hiller**, provided standing to a grandparent when the parents were divorced or separated.[3] However, the compelling state interest and the requirements that make the statute narrowly tailored are present in section 5325. The predecessor section 5311 was available only to the grandparent whose child had died. Thus, section 5311 cases only presented situations in which the grandparent was never directly related to the parent from whom partial custody was sought and not, like here, where the parent from whom partial custody is sought is the grandparent's child. However, that distinction was written into the statute and is not part of the **Hiller** Court's analysis in finding section 5311 constitutional. We see no principled distinction between the basis for the **Hiller** Court's conclusions regarding section 5311 and the substance of section 5325. Therefore, we reject Mother's argument that

---

[3] We have held that section 5325(2), relating to standing for grandparents where the parents are divorce or separated, and its predecessor section 5312, provides standing to grandparents when the parents were never married and/or had never lived together. **See L.A.L. v. V.D.**, 72 A.3d 690, 694 (Pa. Super. 2013).

section 5325 does not permit a trial court to grant partial custody to a grandparent when the opposing parent is the grandparent's child.[4]

Having found that to be the case, we still must afford Mother relief because the trial court did not apply the appropriate presumption. The trial court on the record reviewed the sixteen factors enumerated in 23 Pa.C.S.A. § 5328(a), which it must do in determining a child's best interest. N.T. at 170-82. Further, in its opinion, the trial court explained its rationale pursuant to the additional factors for grandparent custody set forth in section 5328(c):

**(c) Grandparents and great-grandparents. –**

(1) In ordering partial physical custody or supervised physical custody to a party who has standing under section 5325(1) or (2)(relating to standing for partial physical custody and supervised physical custody), the court shall consider the following:

    (i) the amount of personal contact between the child and the party prior to the filing of the action;

    (ii) whether the award interferes with any parent-child relationship; and

    (iii) whether the award is in the best interest of the child.

_____

[4] We also reject Mother's argument that the fact that this case involves partial physical custody instead of visitation is controlling. Mother's Brief at 12. In **Hiller**, the grandmother was awarded partial custody, which our Supreme Court found to be constitutional as applied. **Hiller**, 904 A.2d at 877. As well, our custody statutes no longer include a separate type of physical custody called visitation. Instead, there is shared, primary, partial, sole and supervised physical custody. **Compare** 23 Pa.C.S.A. § 5322 **with** § 5302; § 5323 **with** § 5303.

23 Pa.C.S.A. § 5328(c); *see* T.C.O. at 6-7. The 5328(c) factors mirror those set forth in the predecessor section 5311 which the **Hiller** Court found determinative when upholding the constitutionality of section 5311; namely, the amount of pre-litigation contact between the child and the grandparent, and whether the partial custody would interfere with the parent-child relationship. **Hiller**, 804 A.2d at 887. However, the trial court does not mention the other factor that was critical to the **Hiller** court's holding: the presumption in favor of a fit parent's decision and Grandmother's burden in overcoming that presumption. Because there is no evidence that the trial court considered the presumption that "meaningfully tips the balance in the parent's favor," *id.* at 888, we must vacate the trial court's custody order. We remand the case to the trial court so that it may review the evidence with due consideration for the presumption in Mother's favor and to determine whether Grandmother has met her burden in overcoming that presumption.

Order vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/24/2015

- 15 -