J-S16032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: W.L., FATHER | : | |
| | : | No. 280 EDA 2021 |

Appeal from the Order Entered January 5, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001068-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: J.P.Y.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: W.L., FATHER | : | |
| | : | No. 281 EDA 2021 |

Appeal from the Order Entered January 5, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000096-2020

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED AUGUST 31, 2021**

Appellant, W.L. a/k/a W.J.L. ("Father"), files these consolidated appeals

from the decree entered in the Philadelphia County Court of Common Pleas on

January 5, 2021, granting the petition of the Philadelphia Department of

Human Services ("DHS") to involuntarily terminate Father's parental rights to

_____

[*] Former Justice specially assigned to the Superior Court.

his minor, female child, J.W. a/k/a J.P.Y.W., born in June 2019 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b). Father further appeals from the order dated and entered January 5, 2021, changing Child's permanent placement goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[1]  After review, we affirm.

The trial court summarized the relevant procedural and factual history, in part, as follows:

> The family became known to the Department of Human Services (DHS) due to a General Protective Services (GPS) report which alleged[,] in part, that Child's mother tested positive for cocaine and marijuana at Child's birth, that she used drugs the day before giving birth and [that] she did not receive prenatal care.  The GPS report also alleged that she wanted to place Child for adoption. An Order of Protective Custody (OPC) was obtained on June 25, 2019.  Child has remained in the custody of DHS since that date and remains in the original placement home.  She was adjudicated dependent and committed to DHS on July 9, 2019.
>
> The Community Umbrella Agency (CUA) developed Single Case Plan (SCP)[] objectives for the family and invited Child's parents to attend.  The CUA Case Manager met with them when they became available on October 1, 2019.  Both signed the SCP on that date.
>
> Father requested paternity testing.  The [c]ourt ordered a paternity test, but Father failed to appear for the initial appointment.
>
> . . .

---

[1] Mother's parental rights were terminated by separate decree dated and entered January 5, 2021.  Mother did not appeal this decree or the goal change order and is not a participating party in the instant appeals.

> The [c]ourt ordered paternity testing again at the September 2, 2020 hearing. Father submitted to paternity testing on September 23, 2020. He was determined to be Child's father by probability of 99.997%.

Trial Court Opinion ("T.C.O."), 7/21/21, at 1-2.

Subsequent to regular review hearings during which the court maintained Child's commitment and placement along with Child's permanency goal, DHS filed petitions for the involuntary termination of parental rights and for a goal change on February 7, 2020. Permanency Review Order, 9/2/20; Permanency Review Order, 12/10/19; Recommendation - Permanency Review, 9/23/19. Due to the COVID-19 pandemic, the court conducted a combined termination/goal change hearing virtually on January 5, 2021. Father was present and represented by counsel.[2] Child was represented by a guardian *ad litem*, also referred to as a child advocate.[3] DHS presented the testimony of Rasheeda Brumskill, Community Umbrella Agency ("CUA"), Turning Points for Children, Case Manager Supervisor, the prior case manager; and Christine Cross, CUA, Turning Points for Children, Case Manager, the current case manager. Additionally, Father testified on his own behalf.

---

[2] Mother was not present but was represented by counsel.

[3] Subsequent to determination of a conflict with the Defender Association of Philadelphia, Child Advocacy Unit, the court appointed a guardian *ad litem*/counsel for child pursuant to order entered June 26, 2019. N.T., 1/5/21, at 54.

By separate decree and order dated and entered January 5, 2021, the court terminated Father's parental rights and changed Child's permanent placement goal to adoption.[4]  Thereafter, on January 31, 2021, Father, through appointed counsel, filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5]  This Court consolidated Father's appeals *sua sponte* on March 5, 2021.

On March 2, 2021, the court filed a Notice of Compliance with Rule of Appellate Procedure 1925(a).  **See** Trial Court's Notice of Compliance with Rule of Appellate Procedure 1925(a), 3/2/21.  In doing so, the court stated, in part, "The trial court's primary statements regarding the termination of parental rights appears after argument from counsel. . . ."  **Id.** at 1 (unpaginated).  The court continued, "Furthermore, this [c]ourt addressed the determination that it is in the best interest of the Child for a Goal Change to

---

[4] While the instant permanency review order notes a current goal of adoption as it additionally reflects a goal change to adoption, and the prior order notes a goal of return to parent or guardian, we find that it involves a goal change and is a final order.  **See In re H.S.W.C.-B & S.E.C.-B.**, 575 Pa. 473, 477-478, 836 A.2d 908, 911 (2003) (noting with regard to dependency matters "[a]n order granting or denying a status change, as well as an order terminating or preserving parental rights, shall be deemed final when entered.") (citation omitted).

[5] We observe that the trial court allowed Father's original appointed counsel to withdraw after the entry of the subject decree and order terminating parental rights and changing goal.  Order Granting Motion for Withdrawal and Appointment of New Counsel, 1/7/21.  The court then appointed new counsel who filed the instant appeals.  Letter of Appointment of Counsel, 1/7/21.

Adoption." *Id.* Following broad reference to the record, including witness testimony and exhibits presented, the court further stated, "To the extent that the Pennsylvania Superior Court believes that the trial court's statements on the record do not adequately address any issue on appeal, the trial court will submit a supplemental opinion upon remand." *Id.* at 1-2.

Pursuant to a Judgment Order entered June 21, 2021, the matter was remanded for the trial court to file with this Court within thirty days a Pa.R.A.P. 1925(a) opinion providing the reasons for its decision to involuntary terminate Father's parental rights and change Child's permanent placement goal. The trial court complied and filed an Opinion on July 21, 2021.

On appeal, Father raises the following issues for our review:

A. Whether the trial court erred in changing the Child's goal to adoption and terminating parental rights of Appellant Father.

B. Whether the trial court erred in terminating Appellant's parental rights, the evidence having been insufficient to establish Father caused child to be without essential parental care, nor could that not have been remedied.

C. Whether the [t]rial court erred in terminating Appellant's parental rights, when Father felt that he was going to have sufficient time to complete his objectives from the time the paternity test results were obtained.

D. Whether the [t]rial [c]ourt erred by finding, [sic] that termination of Appellant's rights best serves the Child's developmental, physical and emotional needs and welfare.

E. Whether the [t]rial court erred in terminating Appellant's parental rights, when Father felt that he was going to have sufficient time to complete his objectives from the time the paternity test results were obtained.

F. Whether the [t]rial court erred in terminating Appellant's parental rights, when Father wanted opportunity to complete his

- 5 -

objectives, and then effectively defend the involuntary termination of his parental rights.

G. The errors committed by the court below deprived appellant of his rights to due process and equal protection under the law.

Father's Brief at 3.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re Adoption of S.P.**, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." **Id.** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id.** The trial court's decision, however, should not be reversed merely because the record would support a different result. **Id.** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. **See In re R.J.T.**, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

**In re T.S.M.**, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re M.G. & J.G.**, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." **In re Adoption of T.B.B.,** 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a twofold analysis of the grounds for termination and the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b). We have long held that in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004)

(*en banc*). Herein, we analyze the court's termination decree pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

**In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).

"The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." **In re Adoption of C.D.R.**, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting **In re A.L.D.**, 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **In re A.L.D.**, 797 A.2d at 340 (internal quotation marks and citations omitted).

In addition, when determining whether termination was proper under Section 2511(b), our Supreme Court has stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa.Super. 2012). In **In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]**, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791. However, as

discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, *supra*, 620 Pa. at 628, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

[w]hile a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

Instantly, at the conclusion of the goal change/termination hearing, in finding grounds for termination of Father's parental rights pursuant to Subsections (a)(2) and (b), the trial court reasoned:

        . . .The evidence reflects that [Child] has been -- was placed from the hospital in June, 2019 and adjudicated dependent in July of that same year. She's also been in the same foster home since June, 2019.

        Neither [Mother] or [Father] have fully complied with single case plan objectives, and the [c]ourt will not consider compliance made after the termination petitions were filed in February, 2020. The testimony reflects that she's in a -- she's loved by her foster parents as well as her foster siblings.

        The parents have never cared for this child since she was placed from the hospital. In fact, testimony also reflects that neither parent has inquired about her wellbeing, and that [M]other and [F]ather visited only two times in the life of this case.

        Furthermore, the testimony reflects that the foster parents meet the child's developmental, physical, and emotional needs. She's bonded with the family. Additionally, the child would not suffer irreparable harm if parental rights are terminated.

        The child needs permanency. Thus[,] the [c]ourt finds that it is in [Child]'s best interest to have parental rights terminated and be freed for adoption under grounds -- under Section [2511(a)(1), (2), (5), (8), as well as 2511(b).

N.T., 1/5/21, at 56-57.

In its Opinion filed upon remand, the court added:

Child was born [in June 2019]. She was adjudicated dependent and committed to DHS shortly after birth on July 9, 2019. SCP objectives were developed for reunification with her parents. Father signed the SCP on October 1, 2019. The record reflects that he questioned paternity yet missed the first paternity test appointment. He initially chose not to engage in CUA services but became more engaged in November 2020, which is after the TPR petition was filed by DHS in February 2020.

Father has not substantially completed his SCP objectives to have Child in his care. He has not engaged in drug and alcohol treatment and stated he does not have appropriate housing. He has not progressed beyond supervised visits and only visited twice since she has been in foster care. Child has never lived with Father since she was placed from the hospital. He does [not] have a bond with his daughter. She has been in the same loving foster

- 11 -

home since she was placed. It is the only home she has known. She is bonded with her foster parents and their children.

There must be balance in making a TPR determination. In the case, [**In re J.T.**, 817 A.2d 505, 509 (Pa.Super. 2001),] the Court stated, "A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." [**See Adoption of McCray**], 331 A.2d 652 (Pa. 1975). While children and youth agencies have an obligation to make reasonable efforts to assist parents to achieve reunification, these efforts have a statutory timeline. They do not extend indefinitely.

Father indicated that he wants more time, "at least []before the end of the year. . .", hoping that 2021 would be a better year. The [c]ourt must consider the impact of time in Child's life. In the time that Father chose to stay away from Child, she developed a relationship with her resource family. The testimony on January 5, 2021, reflects that not only is she bonded to them instead of Father, but that it would be traumatic for her to be removed from her resource family. The court concluded that termination would not have a detrimental impact on Child's developmental, physical and emotional needs and welfare. Thus, the termination of Father's parental rights would be in Child's best interests under 23 Pa.C.S.A. [§] 2511(b) of the Adoption Act.

This [c]ourt found that DHS met its burden based on the testimony and documents entered as exhibits. Clear and convincing evidence was presented, therefore this [c]ourt involuntarily terminated Father's parental rights to Child and changed the permanency goal to adoption pursuant to the Adoption Act and Juvenile Act.[6]

T.C.O., 7/21/21, at 10-11 (citations to record omitted).

Father, however, argues that from the beginning of the case he requested a paternity test and wanted to wait for the results to address any objectives aimed at reunification. Father's Brief at 9. He indicates that he attempted to explain why he wanted to wait for the results of a paternity test

---

[6] While the court focused on subsection (a)(5), we find its reasoning also applicable to subsection (a)(2).

prior to commencing any efforts towards his objectives. *Id.* at 10. Father

notes that once the paternity test revealed he was in fact Child's father, he

began working toward completion of his objectives. *Id.* at 11.

Father stresses he completed a parenting class, engaged in another, and

completed housing class. *Id.* He further references visits with Child that were

appropriate and a lack of contact with CUA where he was deemed impaired.

*Id.* Father, however, indicates that he did not have the opportunity to

complete most of his objectives. *Id.* He notes the importance of establishing

paternity and argues it was reasonable for him to request more time to

complete his objectives and to expect that he would be afforded more time in

which to do so. *Id.* at 12-13. Moreover, Father contends that he and Child

were not given the appropriate time to bond. *Id.* at 14. Father states:

> . . .[t]he court erred in terminating Father's parenting rights and
> determining that said termination would best serve the needs and
> welfare of the child,[] when [] Father was visiting with his child,
> was seeking housing for himself and his child,[] attended
> parenting class, previously obtained a parenting certificate,
> completed housing class, was working towards completing of his
> family service plan objectives, and did not intend to relinquish his
> claim to his child or did not intend to refuse and/or fail to perform
> parental duties and, when he wanted confirmation of his paternity
> prior to completing his, when Father wanted opportunity to
> complete his objectives, and then effectively defend the
> involuntary termination of his parental rights and when Father felt
> that he was going to have sufficient time to complete his
> objectives from the time the paternity test results were obtained.
> . . .

*Id.*

Following our review of the record, we find support for the trial court's finding of grounds for termination under Section 2511(a)(2). The record reveals that Father failed to complete his goals aimed at reunification. CUA case manager, Rasheeda Brumskill, who was the CUA case manager until September 2020, testified that Father's objectives were: to contact CUA and participate in services; to attend ARC ("Achieving Reunification Center") for parenting, employment, and housing; to attend Family School; to complete a CEU assessment and comply with any recommendations; to complete three random screens prior to the next court listing; and to participate in supervised visitation. N.T., 1/5/21, at 22; *see also* N.T., 9/2/20, at 9-10. Ms. Brumskill indicated that Father agreed to these objectives and signed the SCP on October 1, 2019. *Id.* at 20, 23. Father acknowledged that he signed the SCP on October 1, 2019, and that both Ms. Brumskill and the current CUA case manager, Christine Cross, reviewed his objectives with him and he was aware of same. *Id.* at 50-51.

Notwithstanding, Ms. Brumskill indicated that during her involvement, Father was non-compliant with his objectives. *Id.* at 22-23; *see also* Permanency Review Order, 12/10/19 (reflecting Father's "non-complian[ce] with all Single Case Plans, Objectives and Recommendations" and noting his discharge from ARC and Family School due to lack of participation, and lack of visitation.). She stated that Father "did not want to complete any objectives and goals until he found out that he was [Child]'s biological father." *Id.* at 23. Ms. Cross explained that while Father did start acting with respect to his

objectives in November 2020,[7] at the time of the hearing, they were not completed. *Id.* at 37-39, 44, 46.

Notably, Father was not engaged in any drug and alcohol treatment.[8] *Id.* at 37. Father had started but not yet completed parenting classes.[9] *Id.* at 37, 44. While he completed housing class, Father did not have appropriate housing.[10] *Id.* at 38, 44. Father missed and needed to reschedule a financial workshop.[11] *Id.* at 38, 44. Lastly, Father participated in only two supervised visits with Child.[12] *Id.* at 33-34, 45. Significantly, Father concedes that

_____

[7] Father started intake at ARC on November 17, 2020. *Id.* at 46, 51.

[8] Father admitted marijuana use to Ms. Cross at his first visit with Child on October 7, 2020. *Id.* at 37. Nonetheless, Ms. Cross did acknowledge that Father never "appeared to be impaired" or "under the influence of anything" during her interactions with him. *Id.* at 43.

[9] Father started parenting classes on December 22, 2020. He had completed two of ten sessions. *Id.* at 37.

[10] Father rented a room which he admitted was not appropriate for Child. N.T., 1/5/21, at 51.

[11] It is unclear if this workshop is related to employment. Ms. Cross, however, indicated that Father does not work and noted that he receives social security. *Id.* at 44.

[12] Father and Mother visited with Child on October 7, 2020, and November 4, 2020. *Id.* at 33-34. A subsequent visit was scheduled for December 9, 2020. Father requested this visit be rescheduled due to car trouble. The visit was rescheduled for December 14, 2020, but was later cancelled due to Father's failure to confirm. *Id.* at 34. Ms. Cross described Child crying on and off during the first visit and noted the visit ended fifteen minutes early at Mother's and Father's request. *Id.* at 33. During the second visit, for which Mother and Father arrived seventeen minutes late, Ms. Cross indicated that Child held
*(Footnote Continued Next Page)*

instead of requesting additional time to complete his objectives, he did not commence action with respect to those objectives until November 2020. *Id.* at 48. As a result, Ms. Cross confirmed that Father had not made any progress in reaching a point where he could parent Child. *Id.* at 40.

For these reasons, we discern no abuse of discretion. The record substantiates the trial court's conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, *supra*, 825 A.2d at 1272; *see also In re Z.S.W.*, 946 A.2d 726, 731 (Pa.Super. 2008) ("We decline to accept the trial court's rational[e] that [the father] was only required to 'attempt the level of parenting consistent with his and the agency's knowledge of parentage.'"). Moreover, Father cannot or will not remedy this situation. *See id.* As we discern no abuse of discretion or error of law, we do not disturb the court's findings.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's

---

a book the entire time and would cry if there was an attempt to take it. Child "didn't talk or smile" and "did not let go of the book until she realized that we were back at her foster home, and she then began to smile." *Id.* at 34. When questioned about additional visitation for Father, Ms. Cross stated, "So[,] we talked if the visits would resume and parental rights were to be terminated[,] then that would [not] be in the best interest due to [Child] not having a bond with either [Mother] or [Father]." *Id.* at 45.

need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

We likewise discern no abuse of the court's discretion in finding termination was proper under Section 2511(b). Critically, Ms. Brumskill recognized that Child did not have a parental bond with Father. N.T., 1/5/21, at 25. Moreover, as to the relationship between Child and her foster family, Ms. Cross described, "She's very bonded with the foster parents and with all their children in the home. She's smiling, always laughing. . . ." *Id.* at 39. Ms. Cross confirmed that Child is "well-cared for and loved" and looks to foster parents to meet all her basic needs. *Id.* These observations were confirmed by Ms. Brumskill. *Id.* at 24-25. As such, Ms. Cross opined that it is in Child's best interests to be adopted. *Id.* at 39. She explained,

> So[,] from my understanding the, you know, parents have not been compliant with any of the goals. The -- [Child] is not bonded with either parent. She's clearly bonded with the foster family, and seems to look forward to returning home. She also constantly has her basic needs met and I just -- I think she would be a great addition to their family.

*Id.*

Ms. Brumskill agreed, stating, "[t]he child's been in the home since June 26, 2019. The family has built a great bond with [Child]. They love her and they're making sure that her basic needs are being met. Father did not want (inaudible) goals and objectives, as he stated that he wanted to find out if he was the biological father. . . ." *Id.* at 25. Ms. Cross further indicated her

belief that Child would not suffer harm if Father's parental rights were terminated. *Id.* at 39-40. Conversely, she expressed that it would be traumatic to Child if she were removed from her foster home. *Id.* at 40.

For these reasons, the record supports the trial court's finding that Child's developmental, physical, and emotional needs and welfare favor termination of parental rights pursuant to Section 2511(b). *See T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.

While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, *supra*, 994 A.2d at 1121. Child is entitled to permanency and stability, for a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Next, we turn to the question of whether the trial court's goal change order appropriately changed the permanency goal to adoption. In so doing, we employ the same abuse of discretion standard of review as noted above. *See In the Interest of L.Z.*, 631 Pa. 343, 360, 111 A.3d 1164, 1174 (2015) (citing *In re R.J.T.*, 608 Pa.9, 9 A.3d 1179, 1190 (2010) for the proposition that the abuse of discretion standard applies in a dependency matter); *see*

*also In re S.B.*, 943 A.2d 973, 977 (Pa.Super. 2008) ("In cases involving a court's order changing the placement goal from "return home" to adoption, our standard of review is abuse of discretion.")

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011) (citations and quotation marks omitted).

Additionally, § 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> . . . .
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

For the reasons we have already discussed throughout this Memorandum, the record confirms that the trial court's decision to change Child's goal to adoption was in her best interest. *See A.B.*, 19 A.3d at 1088-89.

Lastly, as to Father's due process and equal protection challenges, Father merely baldly asserts, "[t]he errors committed by the [c]ourt below deprived [Father] of his rights to due process and equal protection under the law." Father's Brief at 14.

We, therefore, find that Father waived this issue for his failure to develop it properly in his appellate brief. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 611 Pa. 643, 24 A.3d 364 (2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa.Super. 2017).[13]

_____

[13] We note that, even if Father's claim were preserved, it would be without merit.

It is well-settled that infringement on parental rights implicates a natural parent's Fourteenth Amendment right to due process. *See In the Interest of A.P.*, 692 A.2d 240, 242 (Pa.Super. 1997) (stating that natural parents have a "fundamental liberty interest . . . in the care, custody, and management of their children") (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982)). "It has long been
*(Footnote Continued Next Page)*

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b), and changed Child's permanent placement goal to adoption.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/31/2021

---

established that the right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental rights protected by the Due Process Clause of the United States Constitution." *In re S.H.*, 71 A.3d 973, 979–80 (Pa.Super. 2013) (citing *Hiller v. Fausey,* 588 Pa. 342, 358, 904 A.2d 875, 885 (2006), *cert. denied,* 549 U.S. 1304, 127 S.Ct. 1876, 167 L.Ed.2d 363 (2007). "Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." *In re J.N.F.*, 887 A.2d 775, 781 (Pa.Super. 2005). "Due process is flexible and calls for such procedural protections as the situation demands." *In re Adoption of Dale A., II*, 683 A.2d 297, 300 (Pa.Super. 1996) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)). Similarly, equal protection requires that "like persons in like circumstances will be treated similarly." *In re Adoption of C.J.P.*, 114 A.3d 1046, 1057 (Pa.Super. 2015) (citing *Markovsky v. Crown Cork & Seal Co.,* 107 A.3d 749, 766 (Pa.Super. 2014)).

As Father participated in the hearing and was represented by counsel, who had the opportunity to present, and did present, evidence, and cross-examined witnesses on Father's behalf, Father's argument lacks merit.